No. 89-158

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

KEVIN NEWMAN,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Leif B. Erickson, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

     Antonia P. Marra; Bell & Marra, Great Falls, Montana

     For Respondent:

       Hon. Marc Racicot, Attorney General; Elizabeth L.
Griffing, Assistant Attorney General, Helena,
Montana
Ted O. Lympus, Flathead County Attorney, Kalispell,
Montana

Submitted on Briefs:  February 25, 1990

Decided:  April 9, 1990

Filed:

Clerk

Justice Diane G. Barz delivered the Opinion of the Court.

Kevin Newman appeals his conviction of sexual assault, § 45-5-502, MCA, and sexual intercourse without consent, § 45-5-503, MCA, in the District Court for the Eleventh Judicial District, Flathead County. We affirm.

The charges against defendant stem from allegations made by J.G., the seven-year-old daughter of his girlfriend. The precise nature of the relationship between defendant and J.G.'s mother (mother) and her children is unclear. The defendant stayed at mother's residence on a sporadic basis. Defendant and mother also had an infant child, C.G. J.G. and her brother, B.G., age eight, were required to obey defendant and were disciplined by him, but were never encouraged to think of him as a father figure. The children's father (father) had remarried. J.G. told her stepmother that defendant forced her to watch pornographic movies with him. During a telephone call to her stepmother, J.G. asked to come stay at her father's house. Prior to this incident, father and stepmother had considered instituting an action to modify residential custody of the children. Both father and stepmother testified as to their concern about the children's living conditions, including defendant's presence in mother's home.

The day after J.G.'s phone call, father and stepmother contacted Flathead County Sheriff's Department detective Maxine Lamb. Father and stepmother related their concerns about the children's general welfare, including what they knew of defendant's

behavior toward J.G. Lamb recommended they contact Ann Anderson, a social worker for the Montana Department of Family Services. Anderson interviewed both J.G. and B.G. but did not disclose the details of the interview to father or stepmother. It was only after J.G.'s interview with Lamb that father and stepmother were made aware of J.G.'s disclosures regarding defendant's sexual contact with her.

Over the course of several months, during conversations with her stepmother, counselors and the prosecutor, J.G. was able to relate the details of defendant's assaults upon her. At the trial she testified as follows:

> Q. Do you remember telling your stepmother . . . about some movies?
>
> A. Yes.
>
> Q. What were the movies that you told her about?
>
> A. They were about bad people with their clothes off.
>
> Q. Boys and girls?
>
> A. Yes.
>
> Q. And they didn't have any clothes on?
>
> A. No.
>
> Q. What were they doing?
>
> A. They were, like, doing the same thing [defendant] was doing to me.
>
> Q. What was that?
>
> A. Well, he put his finger in my private part and then he put his penis in my butt.

. . .

Q.  [D]id you ever see [defendant] touch his private part?

A.  Yes.

Q.  What did he do?

A.  He was shaking it up and down.

Q.  With his hand?

A.  Uh-huh.

Q.  What would happen?

A.  Water would come out most of the time.

Q.  What did the water look like?

A.  It was white.

Q.  What would he do after the water came out?

A.  Well, most of the time he would just--he would get a towel.

Q.  And do what with the towel.

A.  He would wipe it off.

Q.  Did he ever make you shake his private part up and down?

A.  Yes.

Q.  What would happen.

A.  Water would come out.

. . .

Q.  Did he ever put his private part anywhere else?

A.  In my mouth.

. . .

4

Q. Can you tell us what you had to do?

A. I can't remember. I just had to keep it in my mouth.

Q. What did he do when it was in your mouth?

A. He was moving it up and down.

. . .

Q. When you were watching these movies . . . did it appear like any of the people in the movies didn't like what was happening to them?

A. I didn't like what was happening to them.

. . .

Q. When you and [your stepmother] were crying and you finally told her about the movies, why did you tell her?

A. Because I wanted him to stop.

Q. Why did you tell Maxine Lamb about the sexual abuse? Why did you tell Maxine what he did to you?

A. Because I wanted him to go to jail, because I didn't want him to do it to anybody else.

Q. Who were you thinking about when you were concerned [about] him doing it to anybody else?

A. My sister.

Q. [C.G.]?

A. (Witness nods head)

Q. Were you afraid that he might do it to her?

A. (Witness nods head)

Q. Are you afraid of [defendant]?

A. (Witness nods head)

5

Defendant was charged by information with sexual intercourse without consent in violation of §45-5-503, MCA. The District Court later granted the State leave to amend the information and further charge defendant with sexual assault in violation of §45-5-502, MCA. Defendant's pre-trial motions included a request that the District Court qualify J.G. as a witness and a motion to exclude as hearsay testimony by certain witnesses regarding J.G.'s statements concerning defendant's assault upon her. The District Court denied the latter motion reserving the opportunity to rule on specific testimony at trial. Subsequent to a hearing held during the course of trial, the trial court found J.G. competent to testify. The jury found defendant guilty of both charges against him and the District Court imposed two twenty year sentences, both with ten years suspended and to be served concurrently.

Defendant raises four issues on appeal:

1) Did the District Court erroneously permit the State to rebut testimony given by defendant on cross-examination?

2) Did the District Court err in finding the seven-year-old victim competent to testify?

3) Did testimony given by various witnesses fall within a statutory exception to the hearsay rule prohibiting the same?

4) Did improper remarks made by the prosecution prejudice defendant thus preventing a fair trial?

Defendant first contends the District Court erred in permitting the State to rebut defendant's testimony elicited on

6

cross-examination. Defendant testified on cross-exam that he was a normal heterosexual male with no interest in anal sex, child pornography or sexual contact with children. Over objection, defendant's ex-wife testified on rebuttal that during the course of their marriage he had encouraged her to engage in anal sex with him and that she had seen him become sexually aroused by a pornographic movie depicting a father having sex with his pre-teenage daughter. Defendant contends this was testimony of specific conduct inadmissable pursuant to Rules 608 and 404(b), M.R.Evid. Furthermore, defendant argues the State failed to give notice of character testimony as required by State v. Just (1979), 184 Mont. 262, 602 P.2d 957. Defendant concludes the erroneous admission of this testimony warrants reversal.

The State correctly observes that counsel for defendant did not object to these questions and defendant thus put his credibility at issue by his testimony. The facts of this case are analogous to State v. Norris (1984), 212 Mont. 427, 689 P.2d 243. Norris was charged with two counts of sexual intercourse without consent stemming from an incident involving a teenage babysitter. Norris, 689 P.2d at 244. Norris allegedly assaulted the young woman after luring her to his motel room with the promise of a babysitting job then inducing her to consume alcohol. Norris, 689 P.2d at 244.

In response to the prosecution's question on cross-exam, Lynn Norris testified her husband had never coaxed women to enter into prostitution. Norris, 689 P.2d at 246. The District Court

7

properly allowed rebuttal testimony by Norris's cellmate from a previous incarceration as to statements made by Norris regarding his practice of encouraging women to consume illegal drugs and then forcing them into prostitution. Norris, 689 P.2d at 245. In that case, as in this, the State properly presented testimony rebutting statements made by a witness. Furthermore, "[t]he Just substantive requirements for admissability of 'other crimes or acts' evidence do not apply to rebuttal evidence offered under Rule 404(a)(1)." State v. Anderson (1984), 211 Mont. 272, 292, 686 P.2d 193, 204. We hold the District Court properly admitted the ex-wife's testimony as rebuttal of defendant's statements on cross-examination.

Defendant's second specification of error concerns the lower court's determination that J.G. was competent to testify. Defendant contends that because J.G. did not know where she lived, how long she had lived there, specific dates upon which the sexual abuse had taken place or even a time frame within which the assaults had occurred, she was not competent to testify.

Rule 601(b), M.R.Evid., provides that:

> A person is disqualified to be a witness if the court finds that (1) the witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him or (2) the witness is incapable of understanding the duty of a witness to tell the truth.

The District Court in this case questioned J.G. extensively regarding her understanding of her obligation to testify truthfully. It is within the sound discretion of the District

Court to ascertain the competency of a witness. State v. Howie (1987), 228 Mont. 497, 503, 744 P.2d 156, 159. "We have stated that what is important is the capacity to remember the occurrence and the ability of the witness to relate her impressions of what occurred." State v. Eiler (Mont. 1988), 762 P.2d 210, 213, 45 St.Rep. 1710, 1713. The child's inability to remember her address or specific dates did not render her incapable of testifying as to instances of sexual abuse by defendant. Any inconsistencies within her testimony or possible fabrication would affect J.G.'s credibility not her competency. Eiler, 762 P.2d at 213-14. The jury determines the weight given witness testimony in light of that person's credibility. Eiler, 762 P.2d at 214. The District Court properly found J.G. competent to testify.

Defendant specifies as error the District Court's admission, over objection, of testimony defendant contends was inadmissable hearsay. We note that the District Court repeatedly admonished the jury that certain statements, particularly those made by J.G. to other witnesses concerning defendant's sexual abuse of her, were not admitted for the truth of the statement made, but as evidence that the statements were made at a certain point in time. The first group of statements under contention were descriptions by J.G. of the activities in which defendant compelled her to participate. J.G.'s stepmother, therapist Carol Lee, Ann Anderson, law enforcement officer Maxine Lamb and Dr. Pamela Oehrtman all testified that J.G. described to them the sexual abuse defendant inflicted upon her.

9

Rule 801(c), M.R.Evid., provides that:

> Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

However, pursuant to Rule 801(d)(1), M.R.Evid.:

> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of subsequent fabrication, improper influence or motive. . .

We hold this group of statements is not hearsay according to Rule 801(d)(1).

Our recent holding in State v. Hibbs (Mont. 1989), 780 P.2d 182, 46 St.Rep. 1705, is analogous to the instant case. The issue in Hibbs concerned the admissibility of out-of-court statements made by four children regarding the sexual abuse inflicted on them by Hibbs. Hibbs, 780 P.2d at 185. We found those statements admissible pursuant to Rule 801(d)(1), M.R.Evid., noting that the out-of-court statements were introduced into evidence after the victims testified, and that the defendant repeatedly attacked the credibility of the victims as witnesses. Hibbs, 780 P.2d at 185. Similarly, defendant in the case at hand questioned J.G.'s credibility by repeatedly referring to her possible motives for falsely accusing defendant.

A linchpin of defendant's defense below and his argument before this Court is that the allegations by J.G. were merely one element of her father's campaign to gain residential custody of

10

J.G. and her brother. Defendant made express references to the custody dispute between J.G.'s parents. Defendant also implied that J.G.'s gradual recollection and increased ability to relate the details of his contact with her were symptomatic of her induced fabrication of these allegations. J.G. testified at the trial, was subject to cross-examination and her statements to others were introduced to counter defendant's charge that J.G. fabricated her allegations against him. The District Court properly permitted rebuttal of defendant's assault on J.G.'s credibility by admission of her prior consistent statements.

Counsel for defendant further objected to the following testimony by father:

> Q. And the concerns that you had in the summer of '87 were what?
>
> A. [B.G.] was pretty much a straight-F student. He didn't care. He was real hyper and everything. I went to school with him once on a parent-teacher's conference, and the teacher told me, with me there, that it was like--
>
> . . .
>
> Instead of doing his work, he would lay down on the floor and roll around and be a complete pest in his class. I was told after I went in on the first parent-teacher conference that, and I gave some advice to [B.G.] on it right there.

The District Court allowed this testimony over objection as reflective of the witness' state of mind. As noted above, counsel for defendant repeatedly alleged that her father induced J.G. to fabricate her charges against defendant so that father and stepmother could prevail against mother in an action to modify

11

residential custody. Thus, defendant brought into issue father's motive for seeking a change in custody. The above testimony reveals father's state of mind. As such, father's testimony is admissible as an exception to the hearsay rule pursuant to Rule 803(3), M.R.Evid.

Nurse Karen Skonard testified J.G. related the details of defendant's assaults upon her. Skonard gave expert testimony regarding J.G.'s demeanor as compared with that of a typical sexual assault victim. Skonard's diagnosis was based in part upon these statements by J.G. and was thus admissable as an exception to the rule excluding hearsay pursuant to Rule 803(4), M.R.Evid.

Defendant further contends Lorraine Pierce's testimony regarding mother's statement that defendant would babysit her children was inadmissible hearsay. We disagree.

Mother testified as follows:

> Q. During this period of time, were there occasions when you would leave [B.G.] and [J.G.] along [sic] with [defendant]?
>
> A. When [defendant] was in my home it was when he was with the guy that he worked with and--
>
> Q. Not always, though?
>
> A. Not always, no. If I ever did leave the home, it was just to go to, like, Circle K and be right back home, because he didn't babysit. He wasn't a babysitter. He wasn't my babysitter.
>
> Q. But he did babysit for you on occasion?
>
> A. Just if I went to Circle K and back.
>
> Q. How many times did he babysit for you? Do you know?

12

A. Not very often, because I took the kids wherever I went. I always take the kids wherever I go.

The District Court admitted over defendant's objection the following testimony by mother's neighbor Lorraine Pierce:

Q. Do you recall at that time a time when you were at her house during the summer of '87 and the subject of babysitting came up?

A. Uh-huh.

Q. In what context did that come up?

A. I was over there one afternoon and she said something about that she was going to go play bingo with, I believe, [defendant's] sister, . . . And [J.G.] came over to me and asked me if she could go home with me.

Q. [J.G.] asked you?

A. Yes. She practically was begging . . . [me] to take her home with me.

Q. Was that something she did often?

A. She liked to come down to our house. We live on a farm, and she liked coming out there. But this seemed a little bit more than the usual times she would ask to come out.

Q. What did you tell her?

A. I told her I was busy and I couldn't have her out that night.

Q. What did [mother] have to say at that time?

. . .

A. She said that she didn't need a babysitter, that [defendant] had offered to watch the children that night.

13

Q. And what was [J.G.'s] reaction to that?

A. She looked very terrified. She looked like she wanted to start to cry and ran into her room and slammed the door.

Mother's statement to Pierce was clearly inconsistent with her testimony at trial that defendant never babysat the children for longer than the few moments it took her to run to the corner store. The District Court properly admitted Lorraine Pierce's testimony of mother's prior inconsistent statement pursuant to Rule 801(d)(1), M.R.Evid.

Defendant's final specification of error concerns statements made by the prosecutor and a State witness which defendant argues constitute substantial prejudice requiring reversal of his conviction. Defendant maintains Maxine Lamb's response on cross-exam to the following questions prejudiced him in the eyes of the jury:

Q. Now, did you take any steps to safeguard the fact that [J.G.] may have been creating this story? What steps do you normally take when you interview somebody?

A. Are you asking about the investigative procedure?

Q. Right.

A. Certainly. I felt in this case, Pat, that in my opinion, it warranted getting a warrant for the arrest of [defendant] for these charges, particularly after the interview, after the affect, the indicators from [J.G.]. And then running a criminal history on [defendant], seeing the violence in his background.

The District Court sustained counsel for defendant's objection to

14

Lamb's testimony as being non-responsive and inappropriate. Defendant maintains such testimony caused him substantial prejudice. However, mother previously testified without objection to one incident of domestic violence admitted by defendant and to which the police responded.

Defendant further contends the prosecutor's interjection in the following exchange prejudiced him:

> Q. [By defense counsel] So when did you claim that [defendant] was watching this movie, child pornography?
>
> A. I can't tell you the exact date. It was when we were married.
>
> Q. Ten years ago?
>
> A. No. Probably mid-marriage.
>
> Q. Where did this movie come from?
>
> A. It came from a video store, I think one of the sex shops.
>
> Q. Didn't you know that these movies, you cannot get them locally?
>
> [THE STATE'S COUNSEL]: Your Honor, I am not too sure that is true.
>
> THE COURT: I am not sure that is true, either.

"It has long been the law of this state that prejudice in a criminal case will not be presumed, but must appear from the denial or invasion of a substantial right from which the law imputes prejudice." State v. Miller (Mont. 1988), 757 P.2d 1275, 1281, 45 St.Rep. 790, 796-97. Defendant in this case failed to demonstrate denial or invasion of a substantial right. The jury had sufficient evidence upon which to determine defendant's guilt. We find no

reasonable possibility that these comments contributed to defendant's conviction. State v. Gray (1983), 207 Mont. 261, 268, 673 P.2d 1262, 1266.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices