**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Matthew Wayne TOME, Defendant–Appellant.**

No. 92–2104.

United States Court of Appeals, Tenth Circuit.

Aug. 26, 1993.

344

Joseph W. Gandert, Asst. Federal Public Defender, of Albuquerque, NM, for defendant-appellant.

Louis M. Fischer (Don J. Svet, U.S. Atty., D.N.M., and Tara C. Neda, Asst. U.S. Atty., D.N.M., with him on the brief), Atty., Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before ANDERSON, HOLLOWAY, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Matthew Wayne Tome ("Tome"), a Native American residing on the Navajo Indian Reservation in New Mexico, was convicted of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(c), and 2245(2)(A), (B). Mr. Tome appeals his conviction, challenging the admission of certain hearsay testimony and the government's use of leading questions. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Background

A.T. is the daughter of the defendant and his ex-wife, Beverly Padilla. A.T. was born on June 18, 1985. Tome and Padilla divorced in September 1988. The Navajo Tribal Court awarded Tome and Padilla joint custody of A.T. but granted Tome primary physical custody. From September 1988 until May 1989, Tome had custody of A.T. on weekdays while Padilla had custody on weekends. Tome and Padilla alternated custody of A.T. every two weeks during the summer of 1989, with Padilla having custody from June 16 to June 30, 1989.

In August 1989, Padilla petitioned the Navajo Tribal Court for primary custody of A.T. The Tribal Court denied the petition but awarded Padilla custody during the summer of 1990. At this time, Padilla had remarried and was living in Colorado. A follow-up custody hearing was scheduled for August 24, 1990. Padilla and A.T., however, did not attend that hearing. Rather, on August 27, 1990, Padilla contacted Colorado authorities with allegations that A.T. had been sexually abused by her father, Tome. On August 22, 1991, a superseding indictment charged Tome with knowingly engaging in sexual acts

with his daughter, an Indian child under the age of twelve, in violation of 18 U.S.C. § 1153, 2241(c) and 2245(2)(A), (B). In a Bill of Particulars filed September 10, 1991, the government alleged that the conduct in question occurred on or about June 18, 1989, when A.T. was four years old. Tome's trial began on February 24, 1992.

The government called A.T. as its first witness. She was six and one-half years old at the time of trial. After the court extensively questioned A.T. concerning her ability to distinguish the truth from a lie, she testified before the jury. On direct examination, her testimony consisted mostly of one and two-word answers. In addition, the trial judge permitted the prosecutor to use leading questions to develop A.T.'s testimony pertaining to the alleged sexual abuse. The prosecutor asked mainly "yes or no" questions and also had A.T. demonstrate details of the abuse by using dolls and having A.T. point to parts of the prosecutor's body. Through these means, A.T. testified that Tome removed her clothes, got on top of her, and put his private place where she goes potty and in her mouth. She further testified that after this happened she went to the bathroom and wiped blood off herself with a tissue.

A.T.'s cross-examination occurred over two days, beginning on a Monday afternoon and resuming the following Wednesday morning. On the first day, defense counsel covered numerous topics all unrelated to the alleged abuse. She first established that A.T. knew the prosecutor on a first-name basis but did not know the judge or any of the defense counsel. She then questioned A.T. about the difference between living with her father in New Mexico and her mother in Colorado, focusing on the reasons she might have for wanting to live with her mother. A.T.'s responses to these question on the first day were immediate and ranged from single word responses to complete and relatively detailed sentences.

When A.T.'s cross-examination resumed two days later, it was strained. Almost from the start, when defense counsel asked A.T. about any conversations she had had with the prosecutor on Tuesday, A.T. often provided no audible response. Defense counsel then asked A.T. if she missed her mother when staying in New Mexico and asked her what she thought might happen to her or her mother when they went to court. A.T. testified that she did miss her mother and that she thought that she would be returned to her father while her mother went to jail. After a recess, defense counsel asked A.T. whether she had discussed the alleged abuse with anyone besides the prosecutor and, if so, whether she knew the occupations of those persons. A.T. testified to discussing the matter with several physicians and social workers and stated that their jobs were "to help kids." On recross-examination, when A.T. was asked to describe her testimony on direct examination, she answered that it was "the truth." Defense counsel chose not to ask A.T. about the details of the alleged sexual abuse.

The government also produced several witnesses who testified about statements A.T. made to them. The first witness was Lisa Rocha, A.T.'s baby-sitter and a close friend of A.T.'s mother. Rocha testified that, while she was baby-sitting A.T. on August 22, 1990, A.T. spontaneously told her, "Please don't let my mom take me back to my father." Rocha testified that, when asked why, A.T. remarked that her "father gets drunk and he thinks I'm his wife." Rocha told Padilla about this incident five days later, on August 27, 1990, at which time she and Padilla attempted to question A.T. further about her accusations. When A.T. would not speak with her mother, Padilla left the room. Rocha testified that A.T. said that her father "does nasties to me," which consisted of taking her clothes off, forcing her legs open, and causing a sharp pain in her stomach when he laid on top of her. Finally, Rocha testified that A.T. related going to the bathroom and wiping blood off herself with a tissue.

Next to testify for the prosecution was Dr. Karen Kuper, a pediatrician in Colorado Springs. Kuper testified that Kae Ecklebarger, a Child Protection Service's caseworker, referred A.T. to her office. Kuper examined A.T. on two occasions in September and October 1990. As part of A.T.'s examination, Kuper interviewed her using anatomically

correct dolls. Kuper testified that A.T. told her that her father hurt and scared her by putting his fingers and his "thing" in her vagina. When asked what his "thing" was, A.T. pointed to the doll's genital area. Kuper also testified that A.T. had an enlarged vaginal opening and an abnormally thin rim of hymenal tissue, and that these physical characteristics were consistent with vaginal penetration.

The testimony of Dr. Laura Reich, Chief of Pediatrics at the El Pomar Community Health Center in Colorado Springs, followed. Reich examined and interviewed A.T. on September 21, 1990. Reich testified that A.T. said that "her father had put his thing in her." Reich further testified that A.T.'s hymen was not intact, that her vaginal opening was larger than normal, and that she had an extensive vaginal rash. Reich also testified that A.T.'s physical characteristics were consistent with vaginal penetration.

The government's next witness was Kae Ecklebarger, who was a caseworker in the Colorado Springs Child Protection Services office at the time she interviewed A.T. on August 29, 1990. Ecklebarger testified that A.T. said that her father removed her panties, put her down on the floor, and "put his balls" in her. Ecklebarger stated that A.T. demonstrated intercourse with anatomically correct dolls, attempting to insert the male doll's penis into the female doll and moving the male doll up and down on top of the female doll. Ecklebarger further testified that A.T. stated that her father kissed her on her vaginal area and asked her to touch his penis. Finally, Ecklebarger testified that A.T. said that she wiped blood from herself with a tissue, kept the tissue, and later showed it to her grandmother, saying, "Look what Matthew did to me."

A.T.'s mother, Beverly Padilla, also testified for the government. She stated that she was in the next room when Rocha was talking to A.T. on August 27, 1990. Padilla testified that she heard A.T. tell Rocha about her father pulling her legs apart.

The final witness to relate A.T.'s out-of-court statements was Dr. Jean Spiegel, a pediatrician at the University of New Mexico. Spiegel examined A.T. on September 3, 1991,

when A.T. was six years old and almost two years after the abuse allegedly occurred. Spiegel testified that A.T.'s vaginal opening was abnormally large and that she had very little hymen left. She stated that these physical characteristics were consistent with chronic vaginal penetration. On redirect examination, Spiegel testified that A.T. stated that her father touched her breasts, her "front privates," and "her bottom where her poop comes out."

On March 3, 1992, after Tome testified and presented his own evidence and witnesses, the jury convicted him on all counts. On appeal, Tome alleges the following errors: (1) the admission of alleged hearsay testimony in violation of the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause; (2) the improper use of leading questions to elicit A.T.'s testimony on direct examination; and (3) cumulative error and a fundamentally unfair trial.

## II. A.T.'s Out-of-Court Statements

Tome challenges the testimony of six witnesses concerning A.T.'s out-of-court statements to them: Rocha, Ecklebarger, Padilla, Kuper, Reich, and Spiegel. In our analysis, we address whether the trial court properly admitted the testimony under the Federal Rules of Evidence and, if so, whether that testimony nevertheless violated Tome's rights under the Confrontation Clause.

### A. *Federal Rules of Evidence*

■ The decision to admit evidence is within the sound discretion of the district court. *United States v. Zimmerman*, 943 F.2d 1204, 1211 (10th Cir.1991). We accord heightened deference to the trial court's hearsay rulings. *See United States v. Johnson*, 971 F.2d 562, 571 (10th Cir.1992).

■ The government proffered the challenged testimony of everyone but Ecklebarger as not hearsay under Fed.R.Evid. 801(d)(1)(B), contending that the defense had implied, during its cross-examination of A.T., that she had fabricated the allegations of abuse in order to live with her mother in

Colorado.[1] The government also contended that, even if the proffered testimony were hearsay, it all fell within one of two hearsay exceptions. The government offered the testimony of Doctors Kuper, Reich, and Spiegel under Fed.R.Evid. 803(4) as statements made for the purpose of medical diagnosis or treatment and the testimony of Rocha, Padilla, and Ecklebarger under Rule 803(24)'s "catch-all" exception as having adequate circumstantial guarantees of trustworthiness. We conclude that the testimony of all six witnesses [2] was admissable as not hearsay under Rule 801(d)(1)(B) and therefore do not address the Rule 803 hearsay exceptions.

■ Under Rule 801(d)(1)(B), evidence of a witness's prior consistent statement is not hearsay if the witness is subject to cross-examination concerning his prior statement and it is offered to rebut an express or implied charge of recent fabrication or improper motive. *See United States v. Sutton,* 732 F.2d 1483, 1493–94 (10th Cir.1984), *cert. denied,* 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985). Tome contests the admission of the statements under Rule 801(d)(1)(B) on the grounds that (1) A.T. was not "subject to cross-examination concerning the statement," (2) defense counsel's attempt to cross-examine A.T. did not amount to a charge of recent fabrication or improper motive, and (3) the statements did not fall within the proper scope of the rule because they were made after the declarant had a motive to lie.

### (1) Subject to Cross–Examination

■ We first address Tome's contention that A.T. was not subject to cross-examination as required by the rule because she was unresponsive to certain questions. The Su-

preme Court addressed Rule 801's cross-examination requirement in *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), which involved a prison officer who suffered severe memory impairment after he was attacked and beaten with a metal pipe. *Id.* at 556, 108 S.Ct. at 841. The officer identified his assailant to an FBI agent. At the assailant's trial, however, the officer testified that, while he remembered identifying the assailant, he could not now remember seeing his attacker. *Id.* The court examined the testimony under Rule 801(d)(1)(C), which has the same cross-examination requirement as Rule 801(d)(1)(B). In what it deemed "the more natural" reading of the cross-examination requirement, the Court stated that "[o]rdinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions." *Id.* at 561, 108 S.Ct. at 844. The Court then concluded that the witness was subject to cross-examination notwithstanding his forgetfulness because he answered questions regarding his prior statements and the factfinder could evaluate his prior statements in light of his present inability to remember the factual basis underlying them. *Id.* at 562, 108 S.Ct. at 844.

We first note that the Rule 801(d)(1) standard is not identical to that contained in the Sixth Amendment's Confrontation Clause. *See United States v. DiCaro,* 772 F.2d 1314, 1325 (7th Cir.1985) (citing *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970)), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986). The Confrontation Clause, which we discuss below, protects the accused's right to "an opportunity for effective cross-examination." *See Owens,* 484 U.S. at 559, 108 S.Ct. at 842. In

---

1. Rule 801 defines as hearsay "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). The Rule further provides that a witness's prior statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Id.* Rule 801(d)(1)(B).

2. Although the applicability of Rule 801(d)(1)(B) was a recurring evidentiary issue, the government failed to expressly offer Ecklebarger's testimony as nonhearsay under the rule. This court, however, "is not bound by the evidentiary basis relied upon by the trial court for the admission of the challenged evidence." *Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1331 (10th Cir. 1984).

contrast, Rule 801(d)(1) requires that the witness be subject to cross-examination concerning the prior consistent statement only. The Rule does not require cross-examination concerning the events underlying the statement or the matter asserted therein. *See* 4 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 419, at 179–80 (1980).

A.T. testified at trial and answered questions on cross-examination. Over the course of two days, the defense asked A.T. approximately 348 questions on cross-examination, covering nearly fifty-one pages of trial transcript. On the first day, A.T. answered all of the questions posed to her, all of which were background questions or otherwise not directly related to her allegations of abuse.

Cross-examination on the second day was more difficult. The defense asked about 249 questions, approximately sixty-six of which elicited no audible or discernible response. Defense counsel began by asking A.T. about her meetings with the prosecutor on Tuesday, the day between her first and second days of cross-examination. A.T. acknowledged that she met with the prosecutor for a short period of time but was very reluctant to discuss the content of those conversations, generally stating that she did not remember the specific things they talked about. Except for a few questions about her conversations with the prosecutor, however, A.T. eventually responded to the substance of all of the defense's inquiries.[3]

Thereafter, defense counsel began asking A.T. about her allegations of abuse. After a few questions, the district court called for a recess and made observations on the record about A.T.'s testimony on cross-examination.[4] When questioning resumed, defense counsel asked A.T. many questions about to whom she may have mentioned the abuse, and A.T. answered all but a few of those questions. Her answers ranged from specifically acknowledging or denying making certain statements to claims of forgetfulness. Although she failed to respond initially to this line of questioning, it often was the result of imprecise cross-examination. For example, defense counsel asked A.T. four times whether she remembered talking to a counselor, and four times failed to elicit an audible response, before learning that A.T. did not know what a counselor was. At one time, the court admonished defense counsel, suggesting that the questions might be too complicated for the six- and one-half-year-old witness.

We are mindful that Rule 801's cross-examination requirement "should not be viewed as an empty formalism which can be satisfied by the mere fact that the witness is present and can be required to sit still long enough for questions to be put." *Id.* at 181. Nevertheless, we conclude that A.T. was subject to cross-examination concerning her prior statements alleging abuse. Although A.T. was

---

**3.** We note that when A.T. initially failed to respond, the questions often concerned seemingly irrelevant material. For example, the record contains a series of eight questions about whether A.T. ever helped her grandfather care for his sheep. Five of those questions yielded no audible response; the other three established that A.T. could not remember helping to take care of her grandfather's sheep.

**4.** The court stated:

The record should reflect that when questions are asked of this witness, the questions which she has answered, that the answers are given reasonably quickly, that is within two, three or four seconds in most cases.

But in many cases where a question is asked and the witness does not respond, she has not responded except—excuse me. It has—integrals [sic] of time have elapsed between the time that the question is finished until the next question is asked of up to as much as 45 or 50 seconds.

I don't know what the reason for that is of the witness' inability to comprehend. I sense that some questions are in that category, but there are other questions that appear to be rather simple questions, and the witness nevertheless has not responded and has waited for the next question as much as, as I say, 40, 45 seconds, many times 20 seconds, 25 seconds. And I've been timing that with my watch.

\* \* \* \* \* \*

We have a very unusual situation insofar as this witness is concerned. I would note also on the record that when we started this recess, the witness seemed to be losing concentration. She would look up to the ceiling, would look to the back of the courtroom, she would look over my head, would not in instances face counsel who is inquiring of her.

She twisted and turned, stretched a little bit sometimes. At other times she would put her hand to her mouth and clasp her lips with her hand. We have a very difficult situation here.

reluctant to answer some questions and testified that she did not remember making certain statements, she did ultimately answer most of defense counsel's questions. Our reading of the record reveals that A.T. responded to simple and specific questions about specific persons. Indeed, Tome does not identify any specific topic or issue that he feels was important but about which A.T. would not respond. In short, A.T. did willingly respond to Tome's inquiries on cross-examination.

In addition, where the witness answers numerous questions regarding the prior statements, all of the purposes of cross-examination are served. Cross-examination under oath insures that the factfinder can observe the witness's demeanor while responding to questions in a formal setting. It also enables the defense to probe the circumstances under which the statement was made in order to call into question the accuracy or sincerity of the earlier statement. Those conditions clearly resulted from Tome's cross-examination in this case. Moreover, when the child witness answers some but not all of the questions, the factfinder may have an even greater insight into the witness because it can observe the witness's demeanor while both answering and remaining silent. Under these circumstances, we find that A.T.'s general responsiveness and the jury's ability to observe her demeanor on the stand made her "subject to cross-examination" for purposes of Rule 801.

### (2) Implied Charge of Recent Fabrication

■ Tome next contends that Rule 801 was not applicable because defense counsel did not charge A.T. with recent fabrication or improper motive. It is true that "not every attempt to impeach a witness's credibility constitutes a charge of fabrication." *Gaines v. Walker*, 986 F.2d 1438, 1444 (D.C.Cir. 1993); *see also United States v. Cherry*, 938

F.2d 748, 755 (7th Cir.1991). The trial court has discretion, however, to determine whether the prior consistent statement is offered for such a purpose. *See United States v. Herring*, 582 F.2d 535, 541 (10th Cir.1978); *see also United States v. Montague*, 958 F.2d 1094, 1098 (D.C.Cir.1992).

In this case, the defense's questions on cross-examination clearly implied that A.T. had fabricated the allegations of abuse out of a desire to live with her mother. Defense counsel questioned A.T. at length regarding her preference for living with her mother. A.T. testified that she had friends in Colorado but none in New Mexico, and that she missed her mother when in New Mexico but did not miss her father when in Colorado. Because this line of questioning attacked more than her general credibility or memory, we find that the district court did not abuse its discretion in concluding that the defense had impliedly charged A.T. with fabricating the abuse. *See United States v. Red Feather*, 865 F.2d 169, 171 (8th Cir.1989) (applying Rule 801(d)(1)(B) where defendant implied on cross-examination that child sexual abuse victim was coached by social services counselors and was prejudiced against her father because of prior punishment and discipline); *see also State v. Newman*, 242 Mont. 315, 790 P.2d 971, 975 (1990) (applying state version of Rule 801 where defense repeatedly referred to child sexual abuse victim's possible motives for falsely accusing defendant).

### (3) The Pre-motive Rule

■ Finally, Tome contends that Rule 801(d)(1)(B) does not apply because all of the prior statements were made after A.T.'s alleged motive to fabricate a story of abuse arose. Whether the rule includes such a limitation is an issue of first impression in this circuit.[5] The proper interpretation of the rule is a question of law which we review de novo.

---

5. The government contends that this circuit rejected the pre-motive rule in *United States v. Rios*, 611 F.2d 1335 (10th Cir.1979), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981). The pre-motive rule, however, was not at issue in that case. Rather, *Rios* involved the use of prior consistent statements to counteract the defense's cross-examination regarding the

witness's prior inconsistent statement. *Id.* at 1349. The issue was whether the prior consistent statement had to precede the prior inconsistent statement; we said no. *Id.* While discussing the "order" of certain evidence under the Rule, we did not discuss the witness's motives at the time of making the earlier statements.

While we have not yet had occasion to decide this issue, it has divided the other circuits for years. Although the text of the rule is silent on this point, some circuits require that the declarant's prior consistent statement precede the time that the alleged motive to lie arose. *See, e.g., United States v. Guevera*, 598 F.2d 1094, 1100 (7th Cir. 1979); *United States v. Quinto*, 582 F.2d 224, 234 (2d Cir.1978). Other circuits reject the so-called "pre-motive rule" and do not require the prior consistent statement to precede the alleged motive to lie. *See, e.g., Montague*, 958 F.2d at 1098; *United States v. Pendas–Martinez*, 845 F.2d 938, 942 n. 6 (11th Cir.1988); *United States v. Parry*, 649 F.2d 292, 296 (5th Cir. Unit B, June 1981).[6] We too reject the pre-motive rule and decline Tome's invitation to limit Rule 801(d)(1)(B)'s scope to statements made prior to the existence of the declarant's motive to fabricate.

Those courts that have adopted the pre-motive rule reason that prior consistent statements are "of no probative value to rebut an allegation of recent fabrication when the declarant's motive in making both statements was the same for the simple reason that mere repetition does not imply veracity." *United States v. Harris*, 761 F.2d 394, 399 (7th Cir.1985) (internal quotation omitted). This may be true. As articulated, however, the pre-motive requirement is a function of the relevancy rules, not the hearsay rules. *See Montague*, 958 F.2d at 1098; *United States v. Miller*, 874 F.2d 1255, 1272 (9th Cir.1989). But even as a function of relevance, the pre-motive rule is clearly too broad: a per se rule is untenable because it is simply not true that an individual with a motive to lie always will do so. Rather, the relevance of the prior consistent statement is more accurately determined by evaluating the strength of the motive to lie, the circumstances in which the statement is made, and the declarant's demonstrated propensity to lie.[7]

■ In rejecting the pre-motive rule, however, we do not overlook or devalue the veracity concerns which underlie the rule. To the contrary, we recognize that prior consistent statements made after a strong motive to lie has arisen may evidence only that the declarant is a consistent liar. To determine whether a statement has probative value apart from its repetition, we follow the approach taken by the Ninth Circuit in *Miller*.[8] *Miller* treats a declarant's motive to lie as only one factor—albeit a crucial one—to be considered when evaluating the relevancy of a prior consistent statement under Federal Rules of Evidence 402 and 403. *Id.* at 1274. In doing so, "the trial judge must evaluate whether, in light of the potentially powerful motive to fabricate, the prior consistent statement has significant 'probative force bearing on credibility apart from mere repetition.'" *Id.* (quoting *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir.1986)).

In *Miller*, the court applied this test to the out-of-court statements of two witnesses. The case involved the espionage prosecution of Richard Miller, an agent for the Federal Bureau of Investigation who delivered classified documents to two emigrees from the Soviet Union, Svetlana and Nikolay Ogorodonikova. Svetlana testified during Miller's trial that Miller had never shown or given her a classified document. When the government attempted to impeach that testimony, Miller sought to rehabilitate her testimony through evidence of seven prior consistent statements made by Svetlana. After rejecting a strict pre-motive requirement, the court affirmed

---

**6.** Because the government offered the statements for their full substantive effect, we do not examine the applicability or interpretation of Rule 801(d)(1)(B) with respect to statements offered only to rehabilitate the live testimony. *See United States v. Casoni*, 950 F.2d 893, 905 (3rd Cir. 1991).

**7.** Indeed, courts that have adopted the pre-motive rule appear to factor such information into the equation when determining whether a sufficient motive to lie arose. *See, e.g., Cherry*, 938 F.2d at 756.

**8.** The statements at issue in *Miller* were offered only to rehabilitate the trial witness's testimony, not for the truth of the matter asserted. 874 F.2d at 1272. The court, however, held that the standards for admission under Rule 801(d)(1)(B) are the same whether the evidence is offered substantively or for rehabilitation. *Id.* at 1273. The analysis, therefore, applies equally to the admission of prior statements as substantive evidence.

the exclusion of the statements. The court found that, because all of them were made to federal agents or defense attorneys while she was under criminal investigation or indictment, her motive to fabricate was "powerful," thus stripping the "self-serving" statements of "any significant probative value." *Id.* at 1274.

In contrast, the court affirmed the admission of prior consistent statements made by Marta York, a government witness and Miller's ex-lover. York testified that Miller had told her that he had given one classified document to his "Soviet girlfriend." *Id.* at 1275. When the defense attacked that testimony on cross-examination, the government sought to rehabilitate her testimony by introducing evidence that she had repeated Miller's claim to a friend. The defense contended that the prior consistent statement was not relevant because York was upset about her broken love affair with Miller and thus had a motive to lie. *Id.* The court found that the prior statement, which was made spontaneously, was subject to only a speculative motive to fabricate and had enough probative value independent of its consistency with the witness's trial testimony to be presented to a jury. *Id.* Similarly, in *United States v. Payne,* 944 F.2d 1458, 1471 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992), the court addressed the admissibility under Rule 801(d)(1)(B) of prior consistent statements made by a sexually abused foster child. The defense argued that the victim "may have been angry" at the defendant and therefore "falsely accused him for revenge." *Id.* at 1471 n. 12. The court, however, affirmed the admission of the prior consistent statements, finding that the alleged motive to lie was too speculative. *Id.* at 1471.

 Applying this analysis to the present case, we conclude that the district court

properly admitted evidence of A.T.'s prior consistent statements under Rule 801(d)(1)(B). The record reveals that A.T. spontaneously made her initial allegation of abuse to her baby-sitter. On cross-examination, Tome implied that A.T. fabricated the allegations about her father because she wanted to live with her mother. Although this argument does present some motive to lie, we do not believe that it is a particularly strong one. *See Payne,* 944 F.2d at 1471. Moreover, Tome's contention would require us to believe that A.T.'s statements were the result of a calculated scheme to deceive. Yet Tome has presented no evidence that the five-year-old A.T. possessed the ability to appreciate the causal relationships inherent in the conception and implementation of such a scheme. *See id.; see also State v. Robinson,* 611 A.2d 852, 858 (Vt.1992) (finding defense's claim that child fabricated story of sexual abuse because of attention he received from it highly speculative). Under these circumstances, we believe that A.T.'s consistent statements do carry probative force apart from mere repetition.[9] We therefore find no abuse of discretion in admitting these prior consistent statements.[10]

### B. Confrontation Clause

 Tome contends that, even if the testimony concerning A.T.'s out-of-court statements was admissible under the Federal Rules of Evidence, its admission nevertheless violated his constitutional rights under the Sixth Amendment's Confrontation Clause.[11] We review claims under the Confrontation Clause de novo. *See United States v. Ellzey,* 936 F.2d 492, 495 (10th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 400, 116 L.Ed.2d 350 (1991).

"The Confrontation Clause provides two types of protections for a criminal defendant:

---

9. We do not decide whether this result would obtain where the defendant presents evidence of "coaching" by a parent or relative. Although Tome makes stray accusations that A.T.'s mother coached A.T. into making these statements, he does not rely on that argument and cites no evidence in the record in support of that assertion.

10. Tome did not object that the admission of *all* of these statements together rendered them more prejudicial than probative under Fed.R.Evid. 403, and we find no plain error.

11. The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). Although an out-of-court statement related by a witness at trial constitutes "testimony" against the accused, "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Here, the out-of-court declarant, A.T., was physically present on the witness stand for cross-examination. Tome contends, however, that his right to conduct cross-examination was violated because the witness did not respond sufficiently to his questions. We disagree.

It is clear that "simply putting a child on the stand, regardless of her mental maturity, is not sufficient to eliminate all Confrontation Clause concerns." *United States v. Spotted War Bonnett,* 933 F.2d 1471, 1474 (8th Cir. 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1187, 117 L.Ed.2d 429 (1992); *see United States v. Dorian,* 803 F.2d 1439, 1446 (8th Cir.1986) (concluding that five-year-old witness was unable to testify meaningfully because of age and fright); *see also Commonwealth v. Kirouac,* 405 Mass. 557, 542 N.E.2d 270, 272–74 (1989) (witness resisted answering nearly all questions asked during cross-examination). Ours is not, however, a situation where the child witness was unable to answer questions on the stand. Rather, as discussed above, the record includes fifty-eight transcript pages of A.T.'s cross-examination during which she was generally responsive. Tome nevertheless challenges the sufficiency of the cross-examination because, in response to a number of questions, A.T. either gave no audible response or testified that she could not remember many things.

■ .The Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985). The concerns

animating the Confrontation Clause are satisfied as long as the defendant has the opportunity to expose weaknesses in the witness' testimony. *See Owens,* 484 U.S. at 559, 108 S.Ct. at 842; *see also Kentucky v. Stincer,* 482 U.S. 730, 744, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987). Forgetfulness, for example, does not render cross-examination constitutionally infirm because the defense can use the witness's poor memory and trial demeanor to attack the witness's credibility. *Owens,* 484 U.S. at 559–60, 108 S.Ct. at 842–43; *Fensterer,* 474 U.S. at 20, 106 S.Ct. at 295. In this case, the defendant likewise had the opportunity to mount a successful attack against the partially nonresponsive witness and, in fact, rarely missed an opportunity to comment on the difference between A.T.'s testimony on direct and on cross-examination. Therefore, notwithstanding A.T.'s failure to respond to some questions on cross-examination, we find that Tome's rights under the Confrontation Clause were not violated because A.T.'s testimony provided him a sufficient opportunity to discredit her out-of-court statements.

### III. Use of Leading Questions

■ The trial judge permitted the government to use leading questions during A.T.'s direct examination. We review that decision for an abuse of discretion. *See United States v. Rodriguez–Garcia,* 983 F.2d 1563, 1570 (10th Cir.1993). "In this realm the widest possible latitude is given to the judge on the scene." *Rodriguez v. Banco Cent. Corp.,* 990 F.2d 7, 12 (1st Cir.1993).

Fed.R.Evid. 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." This circuit has long recognized the necessity of using leading questions to elicit testimony from child sex abuse victims. *See Antelope v. United States,* 185 F.2d 174, 175 (10th Cir.1950). Indeed, the Advisory Committee Notes to Rule 611(c) expressly identify the examination of child witnesses as an exception to the general prohibition on the use of leading questions during direct examination. Fed.R.Evid. 611(c) advisory committee's note; *see also United States v. Castro–*

*Romero,* 964 F.2d 942, 943–44 (9th Cir.1992) (leading question used during direct examination of 8–year–old sex abuse victim).

In this case, A.T.'s direct examination did involve a significant number of leading questions. It is evident from the record, however, that A.T. was reluctant to testify about her abuse. In fact, questioning was halted several times in order for A.T. to regain her composure and willingness to discuss the events at issue. The defense twice objected to the leading questions; both times the district judge decided to permit them. Under these circumstances, we cannot say that the district court abused its discretion in determining that leading questions were necessary to develop A.T.'s testimony.

IV. Cumulative Error and Fundamental Unfairness

Finally, Tome argues that "[t]his Court need not decide whether the individual errors discussed herein require reversal of Tome's conviction; it is clear that the cumulative effect of those errors rendered the trial in this case fundamentally unfair." We interpret this assertion to raise two distinct arguments.

First, Tome appears to make a preemptory strike at a potential harmless error analysis. In this regard, he contends that, even if the alleged trial errors were individually harmless, they were not harmless in the aggregate. This argument is unavailing, however, because we already have concluded that the trial court's individual rulings were not erroneous. "[A] cumulative-error analysis aggregates only *actual errors* to determine their cumulative effect." *United States v. Rivera,* 900 F.2d 1462, 1470 (10th Cir.1990) (emphasis added); *see also United States v. Haar,* 931 F.2d 1368, 1377 (10th Cir.1991) (effect of non-errors not included in aggregation).

Second, we interpret Tome's argument to challenge the "fundamental fairness" of his trial under the Due Process Clause of the Fifth Amendment. A trial is fundamentally unfair under the Fifth Amendment's Due Process Clause if it is "shocking to the universal sense of justice." *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (internal quotation omitted). In *Rivera,* we noted that courts may consider prejudicial circumstances that do not amount to error in the course of reviewing for fundamental unfairness, but only when actual error has also occurred. 900 F.2d at 1477. Thus, "the linchpin of the analysis seems to be that an error was committed which, when considered with other circumstances, led to a fundamentally unfair trial." Id.

Here, as in *Rivera,* Tome requests a fundamental unfairness analysis without any actual error on which to hang his proverbial hat. Tome contends that this is a case where the government's scripted evidence, introduced through leading questions, and the defense's inability to cross-examine the source of that evidence combined synergistically to deny the defendant a fair trial. However, we already have approved of the use of leading questions in this case and have determined that A.T. was available for cross-examination under both Rule 801 and the Confrontation Clause. Moreover, the record reveals that the defendant presented his own witnesses and evidence while mounting a continuing attack on the credibility of the government's witnesses, A.T. included. The fact that a number of important evidentiary issues were decided against him, and that the jury chose to believe the government's witnesses rather than his, simply does not shock any universal sense of justice. Tome's trial, though not perfect, was fair.

We **AFFIRM.**