NO.  93-099

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

       Plaintiff and Respondent,

  -v-

OLLIE W. ARLINGTON,

       Defendant and Appellant.



FILED

MAY 16 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Channing J. Hartelius, Hartelius, Ferguson & Baker,
Great Falls, Montana: Brant S. Light, Great Falls,
Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General, Micheal S.
Wellenstein, Assistant Attorney General, Helena,
Montana; Patrick L. Paul, Cascade County Attorney,
Great Falls, Montana

Submitted on Briefs:  March 3, 1994

Decided:  May 16, 1994

Filed:

_____
          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal by the defendant from a jury trial verdict and subsequent sentencing order, of the Eighth Judicial District Court, Cascade County, finding the defendant guilty of aggravated assault and sentencing him to ten years in prison, with six years suspended, plus two years for the use of a dangerous weapon in the assault. We affirm the District Court.

The following are issues on appeal:

1. Did the District Court err by failing to give Arlington's Instruction No. 12?

2. Did the District Court err when it excluded Arlington's proposed expert witness' testimony?

3. Did the District Court err when it granted the State's motion in limine to exclude testimony concerning a possible civil lawsuit by the DeKonings against Arlington?

4. Did the District Court err when it allowed the Emergency Medical Technicians (EMTs) to testify regarding Carl DeKoning's statements made during the trip by ambulance to the hospital?

5. Did the District Court conduct a proper in-camera inspection of DeKoning's chemical dependency rehabilitation records?

6. Was there sufficient evidence to sustain the conviction of aggravated assault?

7. Did the District Court err when it denied Arlington's motion for a new trial?

8. Was Arlington deprived of his right to a fair trial due to

prosecutorial misconduct?

9. Did the District Court err by sentencing Arlington under the weapon enhancement statute?

10. Were Arlington's constitutional rights violated because he was sentenced under the weapon enhancement statute rather than through the charge of felony assault with a weapon?

11. Did the District Court err when it failed to order a new sentencing due to irregularities at sentencing?

12. Did the District Court err when it failed to find an exception to the mandatory minimum sentence for aggravated assault?

FACTUAL BACKGROUND

In order to understand the events which led to the aggravated assault charge against Oliver (Ollie) Arlington (Arlington), the framework around which this incident transpired must be presented. Carl DeKoning (DeKoning), the victim of Arlington's assault, and his wife, Vicki DeKoning (Vicki), moved to Belt, Montana, in about 1985. DeKoning had a history of alcohol abuse, as well as physical and sexual abuse of his wife.

Subsequent to the DeKoning's move to Belt, Vicki became employed by Arlington at the Black Diamond Bar for approximately five years. At some point during their working relationship, Arlington and Vicki began and maintained an affair.

In time, DeKoning discovered the affair and several incidents occurred as a result. DeKoning found Arlington's wallet in his truck. He gave the wallet to Vicki and also went to Arlington's house to tell him that Vicki had his wallet.

3

Nothing more came of the incident with the wallet but as the extramarital relationship continued, DeKoning decided that he would go to talk to Arlington and see if Arlington would take care of Vicki and the DeKoning children, in the event that DeKoning stepped out of the picture. Arlington agreed to take care of them so DeKoning returned home to talk to Vicki about Arlington's decision. However, she did not want to leave her relationship with her husband; she wanted to wait and see if DeKoning would "quit his drinking and straighten up."

At a point shortly after the decision to wait and see whether DeKoning and Vicki would reconcile, the DeKonings decided to go to a show together. Arlington appeared at the show, took Vicki out of the theater and attempted to discuss where their relationship was headed. Although DeKoning did not attempt any action at the show, he appeared at Arlington's house the following day and told Arlington to stay away from his wife, called him names, threatened him, and spit in Arlington's face.

The DeKoning's relationship continued to deteriorate and on June 12, 1992, DeKoning asked Vicki for a divorce. He did not wish to talk about the divorce that day, and, needing some mechanical work performed on his truck, left for a friend's house to use his workshop.

DeKoning worked on his truck at his friend's house, drinking beer as he worked. Upon completion of his mechanical work, DeKoning left his friend's house and proceeded to town. On his way to town, he saw a squirrel in the road and swerved to avoid hitting

4

the squirrel.

In his attempt to avoid hitting the squirrel, DeKoning moved into the opposite lane of traffic, where Bryan Arlington, (Bryan) Arlington's son happened to be driving. Bryan called his father and his father suggested he call Rod Kovak, a Deputy Marshal from Belt. Kovak testified that Bryan did not seem afraid of DeKoning, merely concerned that he might have been drinking. Kovak sought out DeKoning in reference to Bryan's report but could not find him.

Meanwhile, DeKoning continued drinking into the evening, going to Vicki's uncle's house to barbecue steaks. When he returned home, he and Vicki argued over marijuana Vicki had found in DeKoning's pants. He then hit her in the head, took the marijuana and left the house. Later, when she could not locate her sons, she called and determined that the boys were with their father at Vicki's uncle's house.

Vicki does not allow her children to ride with their father when he has been drinking so she decided to go and retrieve the boys. Expecting possible trouble, she called Arlington before she left and stated that if she did not return in ten minutes, Arlington should come looking for her. She testified during trial that when she arrived at her uncle's house, the children were waiting for her and she drove over to her friend's house and stayed and visited for a while.

Vicki arrived back at her home at about 11:30 p.m., whereupon she argued with DeKoning and thereafter, he sexually assaulted her. He testified that. he went out to an addition to the house, after

the assault had ended, smoked some marijuana, cried and decided that his marriage was over. A short time later, he went to bed.

At about 2:00 a.m., the phone rang in the DeKoning home. The phone call was for Vicki, and it was from Arlington, wondering if she was all right. DeKoning heard the conversation, ascertained that the caller was Arlington, and hung up the phone. Arlington called again and DeKoning answered the telephone. According to DeKoning's testimony, Arlington was insisting that DeKoning had tried to harm Bryan. Arlington asked DeKoning to meet him in Armington but DeKoning stated that he would rather meet him at the Arlington home. DeKoning took a beer and left for the Arlington residence.

DeKoning testified that when he arrived at the Arlington residence, he yelled, "hey, you son-of-a-bitch, I'm here" and Arlington flew out of his trailer with a bat in his hand. A struggle followed, with DeKoning trying to get the bat but Arlington hit him in the legs with the bat. DeKoning blacked out momentarily and when he "came around," he tried to poke Arlington in the eye but Arlington hit him in the head with the bat. DeKoning stated that he did not remember what occurred after that point until he woke up in the Intensive Care Unit of the hospital.

Arlington's testimony about the event differed. He testified that he was in bed when he heard someone "hollering" and banging on his door. When he realized that it was DeKoning, Arlington told his son, Bryan, to call the police. He stated that when he arrived at the door, DeKoning "smacked" him and then he hit DeKoning and

6

both men went tumbling out the door.  The two men fought and struggled, kicking each other and falling among a motorcycle, coolers and boxes of all types which were lying on the ground in the area where they had fallen.

According to Arlington, DeKoning was relentless, at one point grabbing Arlington's eye and Arlington, in an effort to "fight off" DeKoning, started. elbowing him.  He stated that DeKoning finally loosened his grip after Arlington continually hit him in the head. Arlington then moved away from DeKoning, Bryan came out the door, Arlington determined that Bryan had not called the police so he called Rod Kovak and asked him to come to the Arlington residence.

At the time of the altercation, Ida Ginger Elam, a neighbor of Arlington's, was awakened when a dog began barking and she heard yelling.  She heard the sound of very hard hitting, similar to the sound of a bat hitting a sandbag.  She heard the sound of a light voice trying to stop the beating.  When the beating did stop, Ms. Elam saw someone go to a truck parked in front of the trailer, enter the truck, drive the truck up the Armington Road and return about five minutes later.  She returned to bed but got up and looked out the window again when she saw lights shining through her window.  When she went to the window, she saw a person in uniform moving about the area.

Deputy Rod Kovak testified that he received a call from Arlington about 2:45 a.m.  Arlington told Kovak that DeKoning was at his house and wanted to fight and he requested Kovak's presence. Arlington called back about three minutes later and told him to

7

hurry. Kovak found DeKoning lying on the ground with a laceration above his eye. He observed that Arlington did not look like he had received any injuries. Arlington reported a fight with fists, elbows, kicking and falling down the stairs. DeKoning reported that Arlington hit him with a bat. When Arlington learned what DeKoning had said about the bat, he requested that Kovak search for a bat or a reasonable facsimile.

Meanwhile, as per his father's orders, Bryan brought a wet cloth to DeKoning to clean his wounds. As DeKoning was cleaning his wounds, Kovak noticed that the blood was already dry on DeKoning's face, neck and hands. However, since the incident had occurred outside the Belt city limits, Kovak called the county deputy and requested his presence.

An ambulance was called and it arrived about 3:10 a.m. EMTs Janice Griffin, Patty Darko and Denise Puppe surveyed the scene and began providing treatment upon their arrival. DeKoning had long bruises on his chest, abdomen, back, and his left side. He was bleeding profusely from his head, he had facial swelling and complained of pain in his head, hands, jaw and legs. Arlington did not need or receive any physical care.

In the ambulance on the way to the hospital, one of the EMTs noticed that DeKoning was bleeding from his ear, an indication of a possible brain injury. They then became concerned with keeping DeKoning awake so they started to question him. In the course of conversing with DeKoning, the EMTs tried to find out what had happened to him. Be stated that he had been hit repeatedly with a

8

bat by Arlington and that Arlington would not stop hitting him despite DeKoning's protests.

Shortly after the EMTs left the Arlington residence, Deputy Tadman, from the county sheriff's office arrived. Arlington reported to Tadman that DeKoning had arrived at his house, threatening to kill him and that a fight had ensued. His report was much the same as that reported to Rod Kovak, a general brawling fistfight. However, Tadman stated that he did not see any marks or signs of a fight on Arlington's person. Be did see some blood on Arlington's shirt. Tadman requested a look at Arlington's shoes and he was shown the tennis shoes Arlington wore during the fight. Tadman searched the residence but found nothing. Be also asked for a statement from Arlington. The property was later searched again and Arlington was ultimately arrested for aggravated assault.

Dr. Gallea, an emergency room physician, was the first doctor to treat DeKoning upon his arrival at the hospital. By the time he arrived at the emergency room, DeKoning could not really remember what had happened so the doctor had to rely on information from law enforcement personnel and the EMTs, who told Dr. Gallea that DeKoning had been involved in an altercation and was hit by a baseball bat. The doctor was concerned with DeKoning's sleepiness because of the possibility of brain injury. Be described DeKoning as having numerous bruises, a cut on his forehead and being quite bloody. The doctor was also concerned from his examination that DeKoning had possible fractures. The doctor testified at trial that DeKoning's injuries were among the worst he had seen from two

men involved in an altercation in the last 20 years.

Dr. **Gallea's** opinion of the source of the injuries was that they were caused by something more than fists, elbows, legs or feet. He said the pattern of the injuries indicated something heavy, elongated and relatively even in its pattern was used in the fight. He also explained that he did not think the injuries were caused by DeKoning falling against an object or objects.

Dr. Schaefer, a neurosurgeon, also treated DeKoning in the emergency room. He noted that **DeKoning's** level of consciousness was impaired and his brain was not functioning normally. From tests conducted by the doctor, it was determined that DeKoning had an actual bruise on his brain, as well as some swelling at that area of the brain. He also had a blood clot between his brain and his skull. When the blood clot and the swelling in his brain resolved, there was an area of the brain which had atrophied or shrunken; this area did not rejuvenate.

Dr. Schaefer opined that the injuries to DeKoning were caused by blunt objects, delivered with substantial force. He considered that the blunt object was a long, cylindrical type of object. The doctor stated that DeKoning continues to have difficulties because of his brain injury, including difficulty with **smell** and taste, concentration, depression, seizures and other problems basic to head injured persons.

Dr. Gorsuch, an orthopedic surgeon, testified that DeKoning had two tibia fractures and an ulna fracture. She testified that the injuries were consistent with being hit by a hard object such

10

as a baseball bat.

Dr. Tacke, a physiatrist, testified that DeKoning suffers memory and language problems due to his brain injury. He also sustained some hearing loss. He reported that DeKoning has some degree of permanent brain injury.

PROCEDURAL BACKGROUND

An information was filed on July 8, 1992, charging Arlington with aggravated assault. A jury trial was held from November 16, 1992 through November 19, 1992. Arlington claimed that he acted in self defense when he was attacked by DeKoning on June 13, 1992. On November 19, 1992, the jury found Arlington guilty of aggravated assault. Arlington was sentenced on December 30, 1992, to ten years in the Montana State Prison, with six years suspended. He was also sentenced to an additional two years, to run consecutively, for the use of a dangerous weapon in the commission of the assault. Arlington appealed to the Supreme Court on December 30, 1992.                    ISSUES

ISSUE ONE

Did the District Court err by failing to give Arlington's Instruction No. 12?

Arlington argues that there is no duty to retreat when one is attacked at his home and he should have been able to provide an instruction to the jury which states that premise. The State counters that the District Court correctly instructed the jury on Montana law applicable to the use of force in the defense of self, others or occupied structures. We agree with the State.

11

Arlington's offered instruction was based on California law. The instructions given by the District Court, Instruction No. 10 and Instruction No. 11, were taken from the pattern jury instructions relating to the use of force in defense of a person (MCJI 3-102) and the use of force in defense of an occupied structure (MCJI 3-103). The use of pattern jury instructions in criminal cases has been approved in State v. Lucero (1984), 214 Mont. 334, 343-344, 693 P.2d 511, 516. Additionally, Montana Criminal Jury Instructions 3-102 and 3-103, are based on §§ 45-3-102 and 103, MCA. It is, therefore, difficult to imagine instructions which would more properly state Montana law on the subject. State v. Bingman (1987), 229 Mont. 101, 112, 745 P.2d 342, 348. Both instructions contain the necessary elements of the statute and properly instruct on the applicable Montana law at issue.

Moreover, "[w]hile a defendant is entitled to have instructions on his theory, he is not entitled to put his arguments in those instructions." State v. Short (1985), 217 Mont. 62, 70, 702 P.2d 979, 984. (Citations omitted.) Even with the offered instructions, Arlington was still able to argue that there was no duty to retreat. Finally, the instructions, viewed as a whole, fully and fairly instructed the jury on the applicable law. We hold that the jury was properly instructed and the District Court properly excluded Arlington's proposed Instruction No. 12.

ISSUE TWO

Did the District Court err when it excluded Arlington's

12

proposed expert witness' testimony?

Arlington proposed that Jerry Lemm, a martial arts instructor, testify as an expert on self-defense regarding two issues: 1) whether "a fist and/or being pushed into objects could have resulted in the injuries to Carl DeKoning and 2) that the force used by Ollie Arlington was not excessive." Arlington asserts that Lemm could have helped educate the jury as to how the injuries occurred, the effect of adrenaline on a person, the amount of force needed to injure someone and he could have enlightened the jury as to how to properly view the photographic evidence. The State contends that the determination that a witness is an expert is within the discretion of the trial court and the determination will not be disturbed upon appeal absent an abuse of discretion. Moreover, the State insists that the issue of reasonable force is a factual determination for the jury.

Again, we agree with the State. Rule 702, M.R.Evid., governs the admissibility of expert testimony and it provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

"The determination that a witness is an expert is largely within the discretion of the trial judge, and such determination will not be disturbed on appeal unless the court is shown to have abused its discretion." State v. Evans (1991), 247 Mont. 218, 229, 806 P.2d 512, 519.

In the instant case, the issue about which Mr. Lemm was

13

supposed to educate the jury was whether the force used by Arlington was excessive. This issue is a factual determination, within the province of the jury. State v. Crabb (1988), 232 Mont. 170, 174, 756 P.2d 1120, 1123. However, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." State v. Howard (1981), 195 Mont. 400, 404, 637 P.2d 15, 17. (Citation omitted.)

The crucial question is "whether the subject is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness, or whether the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." State v. Campbell (1965), 146 Mont. 251, 258, 405 P.2d 978, 983. The issue of reasonable force is one which the jury itself can determine without the assistance of an expert such as Mr. Lemm. See Howard, 637 P.2d at 17. Moreover, Lemm is not a medical expert and therefore not qualified to testify about the injuries or the effect of adrenaline on the body. Therefore, we hold that the District Court did not abuse its discretion in excluding the testimony of Jerry Lemm.

ISSUE THREE

Did the District Court err when it granted the State's motion in limine to exclude testimony concerning a possible civil lawsuit by the DeKonings against Arlington?

Arlington argues that the District Court should have allowed him to cross-examine Carl and Vicki DeKoning about a contemplated

14

civil action against Arlington because the civil action relates to the credibility of both Carl and Vicki. The State asserts that if a civil action had indeed been filed against Arlington, it would have been relevant for the appellant to cross-examine the DeKonings about the lawsuit. However, since no action was filed before the criminal trial took place, any testimony concerning a future lawsuit would have been speculative.

There are two views as to whether a defendant may cross-examine an opposing party concerning a contemplated civil lawsuit. The majority view holds that a defendant can cross-examine a witness concerning a contemplated future civil action against a defendant. See State v. Underwood (1979), 281 N.W.2d 337; State v. Ferguson (1983), 450 N.E.2d 265; Wooten v. State (1985), 464 So.2d 640. The minority view holds that precluding a defendant from cross-examining a witness about a contemplated civil action does not deny the defendant's right to impeach a witness by showing interest, motive or bias because potential litigation is speculative and uncertain. See People v. Martinez (1983), 458 N.E.2d 104 and People v. Bradford (1979), 397 N.E.2d 863.

This is an issue of first impression in Montana and a careful review of case law from other jurisdictions has convinced us that the majority view is the correct approach. "It is beyond question that a witness' bias and prejudice by virtue of pecuniary interest in the outcome of the proceeding is a matter affecting credibility under [Rule 611(B)]." Ferguson, 450 N.E.2d at 270. Additionally,

"[t]he general rule is that the pendency of a civil action brouyht against an accused by a witness in a

15

criminal case is admissible as tending to show interest and bias of the witness to prove a motive to falsify, exaggerate or minimize on his part, in other words, to support a claim that such witness' testimony may be false or inaccurate, intentional or otherwise. Such evidence may be introduced in cross-examination...

The rule has been extended to the situation where no civil action has been commenced, but such a suit is or may be contemplated, as in the case of consultation with, or hiring of, an attorney."

Ferguson, 450 N.E.2d at 270.  (Citation omitted.)

In the instant case, the defendant was not allowed to cross-examine the DeKonings about their attorney's request for a copy of Arlington's insurance policy or DeKonings' statements to the Belt community about a possible civil action against Arlington.  Under Rule 401, M.R.Evid., "[r]elevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant." See also Underwood, 281 N.W.2d at 341. Also, Rule 607, M.R.Evid., provides that the credibility of a witness may be attacked by any party.  The contemplated lawsuit was certainly relevant evidence affecting the credibility of both Carl and Vicki DeKoning.  The trial court's decision to prevent the defendant from cross-examining the DeKonings was error because the jury was entitled to hear evidence that the DeKonings had an interest in the outcome of the trial.  Underwood, 281 N.W.2d at 341.

We conclude however, that the error was harmless.  There was extensive evidence that Arlington's attack on DeKoning was excessive and unreasonable.  Ferauson, 450 N.E.2d at 270-271, footnote 5.  The fact that the DeKonings were contemplating a civil action against Arlington would not have materially affected the jury's verdict in the face of the overwhelming evidence provided by

16

the medical testimony and photographic evidence that DeKoning was severely beaten. Additionally, there was already sufficient evidence to show that DeKoning was biased against Arlington.

Therefore, we adopt the majority view that the proper approach to the question of whether a defendant may cross-examine a witness regarding a contemplated civil action against the defendant is to allow the cross-examination. We further hold that, in the instant case, the failure to allow the cross-examination to proceed was a harmless error.

ISSUE FOUR

Did the District Court err when it allowed the Emergency Medical Technicians (EMTs) to testify regarding Carl DeKoning's statements made during the trip by ambulance to the hospital?

Arlington asserts that the trial court erred when it allowed the testimony of the EMTs as to DeKoning's statements in the ambulance enroute to the hospital because Montana law clearly provides that only medical doctors can testify as to hearsay statements made for the purposes of medical diagnosis or treatment. See Rule 803(4), M.R.Evid. Arlington further insists that even if Montana was to allow EMTs to testify to hearsay statements for the purposes of medical diagnosis, the State failed to lay any foundation that such testimony was necessary for diagnosis. The State declares that Rule 803(4), M.R.Evid., applies to nurses, ambulance attendants and even family members as long as that person is providing diagnosis or treatment.

The medical diagnosis and treatment exception to the hearsay

17

rule is Rule 803(4), M.R.Evid., and provides:

> Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Statements made for the purpose of diagnosis or treatment must satisfy a two-part test in order to come within this exception to the hearsay rule. State v. Harris (1991), 247 Mont. 405, 808 P.2d 453. First, the motive for making the statement must be consistent with seeking medical treatment. Second, the statement must be such as would be relied upon by a doctor when making decisions regarding diagnoses or treatment.

Montana cases involving the application of Rule 803(4), M.R.Evid., have heretofore found that the medical diagnosis exception applied only to medical doctors. However, these cases have considered incidents of sexual abuse with young children.

In State v. J.C.E. (1988), 235 Mont. 264, 767 P.2d 309, this Court concluded that it would not extend the medical diagnosis and treatment exception beyond medical doctors in this case because Stuart, an unlicensed psychologist, was not licensed to render diagnoses and therefore could not testify about such diagnoses. Moreover, we were concerned that children might not comprehend the necessity to tell a doctor the truth in order to aid in the diagnosis and treatment of the child, and therefore, it would be difficult to meet the first requirement of the medical diagnosis and treatment exception to Rule 803(4), M.R.Evid. J.C.E., 767 P.2d

18

at 314.

In Harris, we again declined to extend the medical diagnosis and treatment exception to persons other than doctors, again in the context of hearsay statements from young children. We reiterated our concern from J.C.E., that the trustworthiness of statements made by a young child is not assured because the child does not comprehend the importance of telling the doctor the truth in order to aid in diagnosis and treatment.

However, we also stated:

> While we agree with the State that in some cases hearsay statements made to persons other than physicians may be admissible under the medical diagnosis and treatment exception, we once again decline to extend the exception beyond medical doctors in cases involving abuse of young children because we cannot be assured that such statements are "within the purpose of the exception."

Harris, 808 P.2d at 457. (Emphasis added.)

We conclude that this is a proper case for extending the medical diagnosis and treatment exception to emergency medical technicians as first responders in a medical crisis. We do not have the concerns over trustworthiness that were present in J.C.E. and Harris: in the present case, we have an adult who has been severely beaten and is being treated by EMTs as the first medical personnel to respond to DeKoning's injuries. There is no evidence that the EMTs fabricated their testimony or had any interest in his statements other than to appropriately treat him for his injuries.

Further, the statements by DeKoning related that Arlington had repeatedly hit him with a baseball bat. These statements, told to medical personnel, meet the two-part test followed in Harris, 808

19

P.2d at 457. First, his statements were consistent with seeking medical treatment; the EMTs had to know how he was injured to know how to treat him and how to conduct their examination. Second, the statements that he was hit repeatedly by a baseball bat are the type of statements a physician would rely on in making his diagnosis and developing his treatment plan; in fact, the statements were relied upon by Dr. Gallea, the emergency room physician who treated DeKoning when he arrived at the Deaconess Hospital in Great Falls.

The statements were related by the EMTs because of the fact that DeKoning's condition had deteriorated by the time the ambulance reached the hospital. DeKoning had become very sleepy because of his head injury and was no longer a clearly coherent patient. Additionally, DeKoning's statements about how he sustained his injuries are consistent with his injuries: he had injuries suggestive of being hit by a long, hard object.

The medical diagnosis and treatment exception to the hearsay rule, Rule 803(4), has been extended to other medical personnel by Oregon in State v. Jensen (1992), 837 P.2d 525. In Jensen, a three year old boy's statements to a nurse that his "daddy" placed him in a bathtub filled with very hot water, were admitted under Rule 803(4) as an exception to the hearsay rule.

The nurse's testimony was admitted under a substantially similar test for admissibility because the statements concerned the very reason the child had been admitted for emergency care. Furthermore, the child's statements were in response to questions

asked by the nurse to calm the child and obtain a medical history for the purposes of medical diagnosis and treatment. The information allowed the nurse to determine the proper course of treatment for the child. The child's statements were found to describe "the inception or general character of the cause [or] external source" of the injuries. Finally, the statements were pertinent to diagnosis and treatment, thus meeting all the criteria for a hearsay exception for statements for the purpose of diagnosis and treatment. The Jensen court, therefore, concluded that the nurse's statements were properly admitted under Rule 803(4).

Here, in view of the fact that the EMTs were the medical profession's first responders in a medical crisis and the fact that testimony from the EMTs met the two-part Harris test and contained sufficient guarantees of trustworthiness, we hold that the testimony from the EMTs was properly admitted under the medical diagnosis exception of Rule 803(4), M.R.Evid.

Because we have held that the testimony of the EMTs was admissible under the medical diagnosis exception of Rule 803(4), M.R.Evid., we will not address the argument that the testimony was admissible under the excited utterance exception.

ISSUE FIVE

Did the District Court conduct a proper in-camera inspection of Carl DeKoning's chemical dependency rehabilitation records?

Arlington maintains that the court's in-camera review of DeKoning's records was in error because the court provided only a summary of the records, not the actual contents of the records.

21

Arlington believes that it was not the prerogative of the court to decide what information the defendant should receive. The State, however, contends that the court had no duty to disclose DeKoning's confidential records for exculpatory and impeachment material; the court can simply provide a summary of pertinent evidence from the report. Moreover, the State relates, there is nothing in the District Court record to demonstrate what type of summary the court provided to Arlington.

Arlington did not seek to have DeKoning's chemical dependency rehabilitation records or the summary of the records filed on appeal to this Court. Miller v. Western Guaranty Fund Services (1994), ___ Mont ___, ___ P.2d ___, 51 St.Rep. 233, 236. We will not presume that the District Court erred in its "in-camera" evaluation of DeKoning's records: without the records or the summary, this Court cannot possibly review the District Court's decision to provide Arlington with a summary of those records. Miller, 51 St.Rep. at 236. See also, Palmer by Diacon v. Farmers Ins. (1993), __ __ Mont. ___, 861 P.2d 895, 906. It is the appellant's obligation to insure that the record on appeal is complete and accurate. Arlington should have requested the District Court to seal the records and include the records and the summary in the District Court file. Miller, 51 St.Rep. at 236. See also State v. Little (1993), ___ Mont. ___, 861 P.2d 154, 158.

Additionally, Arlington was able to undermine DeKoning's credibility without the access to the actual records at issue. He

22

elicited testimony from DeKoning admitting that he (DeKoning) needed to control his alcohol and drug abuse and needed to control his anger as associated with his drinking. Arlington informed the jury that DeKoning had been convicted of assault and had physically and sexually assaulted Vicki.

In view of the fact that there is no record for this Court to review, we have no choice but to affirm the District Court's decision to evaluate DeKoning's records and provide Arlington with a summary of relevant exculpatory and impeachment material.

## ISSUE SIX

Was there sufficient evidence to sustain the conviction of aggravated assault?

> The standard for review of the sufficiency of the evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'

State v. Cyr (1987), 229 Mont. 337, 339, 746 P.2d 120, 122. (Citation omitted.)

Arlington asserts that he was entitled to use the amount of force he used even if he was mistaken about the amount of force necessary in the incident. He contends that he was acting in self defense on the early morning in question. The State counters that there is sufficient evidence to support the conclusion that Arlington purposely and knowingly caused DeKoning's injuries.

In order to establish the justifiable use of force, as Arlington pled as an affirmative defense, three elements must be proven. These elements are:

23

(1) that the defendant was not the aggressor,
(2) that the defendant reasonably believed that he was in imminent danger of unlawful harm, and
(3) that the defendant used reasonable force necessary to defend himself.

State v. Popescu (1989), 237 Mont. 493, 495, 774 P.2d 395, 396-397. We need go no farther than to state that the defendant in the instant case cannot meet the third element of the test for justifiable use of force. The testimony presented at trial, particularly the medical testimony and photographic evidence, clearly demonstrates that Arlington did not use reasonable force to defend himself.

After our review of the record, we also conclude that there was sufficient evidence to convict Arlington of aggravated assault. Section 45-5-202(1), MCA, provides that "[a] person commits the offense of aggravated assault if he purposely or knowingly causes serious bodily injury to another." "Purposely" is defined in § 45-2-101(58), MCA, as follows:

> [A] person acts purposely with respect to a result or to conduct described by a statute defining an offense if it his conscious object to engage in that conduct or to cause that result. When a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense. Equivalent terms such as "purpose" and "with the purpose" have the same meaning.

"Knowingly" is defined in § 45-2-101(33), MCA, as:

> [A] person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct.

24

> When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence. Equivalent terms such as "knowing" or "with knowledge" have the same meaning.

In the instant case, the injuries to DeKoning were so severe that a jury could reasonably believe that Arlington purposely and knowingly caused the injuries. They could reasonably conclude that he did not act in self defense, but rather, he continued to beat DeKoning after he had rendered him incapable of further attack. As a result of the incident, DeKoning sustained two broken legs, a broken hand, a potentially life threatening brain injury as well as numerous cuts, lacerations and bruises. The brain injury healed to a certain degree but DeKoning did sustain some permanent brain damage. Arlington stated that he was aware that there was a high probability of serious injury when two people are engaged in a fight such as the one in which he and DeKoning were engaged.

Although Arlington insisted he injured DeKoning solely through the use of his fists, elbows and legs, the doctors, to a number, opined that it was very unlikely that the injuries were produced by Arlington using his fists and his feet, especially since he was wearing tennis shoes. Dr. Gallea, the emergency room physician, stated that "[t]hese injuries rank as among the most severe that I've seen from a fight between two people." Dr. Gallea has been practicing medicine in an emergency room setting for about 20 years. When he was asked if he had an opinion about how the injuries were caused, he stated that he was quite positive that:

> [t]hese injuries had to be caused by the assailant using something other than simply fists or parts of his own

25

body. And I say that because, in part, the consequence of the injury is so severe, and in part because of the shape and pattern of the injuries, on the severity.

The blows he received were severe enough, strong enough to fracture his skull and fracture the shin bone on the right side. And these are very strong bones that I don't believe could be broken simply by being hit by a fist.

And the injuries caused hemorrhage of the brain, which is also is more severe than I've ever seen from a fight simply involving fists.

Then the pattern of the injuries shown in the photographs suggest to me that something other than fists was used. It seems like it's something that was heavy and elongated and relatively even in its pattern since the bruises have that elongated symmetrical even pattern to them.

The doctors also opined as to why they felt the injuries were not sustained from falling on the steps or any of the objects in the area where the fight took place. The pattern of the injuries, as stated above, and the fact that there were no slivers of wood or pieces of stain or paint, suggested that the steps, railing, tail pipe of the motorcycle or the cooler were not involved in the fight, to any great extent.

There was additional testimony that Arlington used a weapon to excessively and severely beat DeKoning, who, the evidence shows was unarmed. The EMTs testified that DeKoning told them that Arlington repeatedly hit him with a baseball bat. Arlington's neighbor reported hearing the sound like a baseball bat hitting something at the time the assault was taking place.

The jury was entitled to believe that the injuries were not caused by fists, kicks or falls against objects in the area where the fight took place. They were entitled to believe that the injuries were caused by a severe beating with a baseball bat. The

26

jury reasonably concluded from the testimony and photographs of the victim, that Arlington used excessive and unreasonable force against DeKoning. The jury did not believe Arlington's claim of self defense but did believe that Arlington purposely and knowingly caused serious bodily injury to DeKoning. State v. Bower (1992), 254 Mont. 1, 9, 833 P.2d 1106, 1111-1112. We hold that there was sufficient evidence to support Arlington's conviction of aggravated assault.

ISSUE SEVEN

Did the District Court err when it denied Arlington's motion for a new trial?

On January 21, 1993, Carl and Vicki DeKoning filed a civil complaint against Arlington in the Eighth Judicial District Court, Cascade County. Count I of the complaint alleges that negligent conduct by Arlington caused DeKoning's injuries. Count II alleges the injuries were caused by Arlington's intentional conduct. Thereafter, Arlington filed a motion in the District Court for a new trial based on newly discovered evidence.

Arlington contends that the civil complaint is an admission by the alleged victim that Arlington's conduct was not purposeful and knowing. He asserts that this evidence would surely have changed the outcome of the trial. The State argues that the evidence does not satisfy the six criteria necessary to warrant a new trial where the basis for the motion is newly discovered evidence.

State v. Greeno (1959), 135 Mont. 580, 586, 342 P.2d 1052, 1055, identifies the six criteria which must be met to warrant a

27

new trial:

> (1) That the evidence must have come to the knowledge of the applicant since the trial;
> (2) that it was not through want of diligence that it was not discovered earlier;
> (3) that it is so material that it would probably produce a different result upon another trial:
> (4) that it is not cumulative merely--that is, does not speak as to facts in relation to which there was evidence at the trial:
> (5) that the application must be supported by the affidavit of the witness whose evidence is allege to have been newly discovered, or its absence accounted for; and
> (6) that the evidence must not be such as will only tend to impeach the character or credit of a witness.

The State insists that Arlington cannot meet the third and sixth criteria under Greeno, and because all criteria are not met, Arlington's motion must fail. Cyr, 746 P.2d at 122-123. We agree with the State's assessment on this issue.

The evidence adduced during trial, through testimony and photographs, was. sufficient to support the contention that Arlington's actions were purposeful and knowing. The excessive force used by Arlington and the severity of the injuries which followed, convinced the jury that Arlington intended his actions. We held, in the previous issue, that the jury correctly concluded that Arlington's conduct was intentional.

The third criterion of Greeno cannot be met here. The civil complaint filed by DeKonings was not so material as would have produced a different result upon another trial. The evidence was simply overwhelming that Arlington's conduct was not merely negligent, but purposeful and knowing.

Furthermore, the District Court, in its denial of the motion for a new trial, noted that new evidence which goes only to impeach

28

the credibility of a witness is not a sufficient basis upon which to grant a new trial. The civil complaint would be used at a new trial to impeach the credibility of Carl and Vicki DeKoning. Under the sixth Greeno criterion, this is not a permissible reason to grant a new trial.

State v. Lewis (1978), I77 Mont. 474, 483, 582 P.2d 346, 351, states that the decision to grant a new trial lies within the discretion of the trial court and will not be disturbed unless a clear abuse of discretion is shown. Here, evidence supports the trial court's decision to deny the motion for a new trial so no abuse of discretion is shown and, accordingly, we hold that the District Court did not err in denying Arlington's motion.

ISSUE EIGHT

Was Arlington deprived of his right to a fair trial due to prosecutorial misconduct?

Arlington alleges that the prosecution engaged in a continuing course of misconduct which violated his right to a fair trial. "[F]or reversible error in a criminal case it must be established that there was a denial of a substantial right of the defendant as a result of an alleged error." State v. Watkins (1971), 156 Mont. 456, 465, 481 P.2d 689, 694. Prejudice in a criminal case will not be presumed, it must be established by the record that the statements made by the prosecution denied the defendant a substantial right. State v. Nichols (1987), 225 Mont. 438, 448, 734 P.2d 170, 176. See also State v. Newman (1990), 242 Mont. 315, 325, 790 P.2d 971, 977. We determine that in the face of the

29

overwhelming evidence supporting Arlington's conviction, errors committed by the prosecution are deemed harmless. However, we will discuss each alleged error in turn.

a. Arlington contends that he was not provided with a crime victim's statement of Carl DeKoning despite the State's agreement to provide the document. The State argues that Arlington cannot complain that the State failed to provide him with the report because there is nothing in the District Court record that shows DeKoning actually filed a report. The State also argues, and Arlington does not dispute, that the appellant never raised this issue at trial.

The document at issue here is, apparently, the "Victims Claim Form" filed by DeKoning on or about August 17, 1992, with the Crime Victims Unit of the Department of Justice, in order to obtain benefits under the Crime Victims Compensation Act of Montana, Title 53, Chapter 9, part 1, MCA. The claim form with the cover letter from DeKoning's attorney was not included as part of the District Court record on appeal, but Arlington's counsel attached a copy of both documents to his reply brief on appeal. The impropriety of that aside, <u>see</u> Iverson v. Bouma (1982), 195 Mont. 351, 363, 639 P.2d 47, 53, it is the appellant's (Arlington's) responsibility to ensure that documents necessary for the appeal are made a part of the record and are properly filed with this Court. (See Issue 5). <u>See also, Miller,</u> 51 St.Rep. at 236. Moreover, this Court will not presume prejudice occurred and a defendant's substantial rights were violated unless that fact can be established by the record.

30

<u>Newman,</u> 790 P.2d at 977; <u>Nichols,</u> 734 P.2d at 176.

Furthermore, the fact that Arlington did not raise this issue before the District Court, in general circumstances, would bar him from raising this issue on appeal under § 46-20-104, MCA. Section 46-20-104(2), MCA, provides:

> Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affect the judgment. Failure to make a timely objection during trial constitutes a waiver of the objection except as provided in § 46-20-701(2).

Section 46-20-701(2), MCA, provides exceptions to the general rule that failure to object may constitute a waiver of the objection under § 46-20-104, MCA. State v. Reynolds (1990), 243 Mont. 1, 9, 792 P.2d 1111, 1116. Section 46-20-701(2), MCA, provides:

> (2) Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. No claim alleging an error affecting jurisdictional or constitutional rights may be noticed on appeal, if the alleged error was not objected to as provided in 46-20-104, unless the defendant establishes that the error was prejudicial as to his guilt or punishment and that:
> (a) the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application:
> (b) the prosecutor, the judge, or a law enforcement agency suppressed evidence from the defendant or his attorney that prevented the claim from being raised and disposed of; or
> (c) material and controlling facts upon which the claim is predicated were not known to the defendant or his attorney and could not have been ascertained by the exercise of reasonable diligence.

Arlington argues that the prosecution suppressed the report, providing for an exception under § 46-20-701(2)(b), MCA. However, there is no evidence in the record that the prosecutor attempted to

33

suppress the report or ever had the report in her file. Reynolds, 792 P.2d at 1116.

We also note that the claim form was available to Arlington and his counsel as a public document under § 53-g-107, MCA, and that at some point he did obtain a copy of the report and transmittal letter. When he did receive the report, Arlington should have sought to have the report included in the record. Arlington cannot demonstrate that the alleged error was prejudicial as to his guilt or innocence and that the prosecution suppressed the report because there is no proof filed in the District Court record to establish the existence or content of the report.

Finally, Arlington argues that this Court should, nevertheless, review the prosecution's alleged misconduct here under the "plain error" exception to § 46-20-104, MCA. The "plain error" doctrine provides a remedy where substantial rights of a party have been infringed. State v. Wilkins (1987), 229 Mont. 78, 80, 746 P.2d 588,. 589. The doctrine exists to prevent "manifest injustice." Wilkins, 746 P.2d at 589.

This rule, however, is to have limited application:

The power of discretionary review is to be employed sparingly. As the Commission Comments to Rule 103, M.R.Evid. indicate, the plain error doctrine "will be used in exceptional cases and should not be relied upon by counsel." We will invoke plain error only when it is necessary to insure a fair and impartial trial.

Wilkins, 746 P.2d at 589. (Citation omitted.)

This is most certainly not the exceptional case envisioned to invoke the "plain error" doctrine. Wilkins, 746 P.2d at 589. Since Arlington, nevertheless, asserts that "suppression" of this

32

document is grounds for invocation of the plain error rule, we dispose of this contention by merely noting that there is absolutely _nothing_ in either the claim form or the cover letter that is even remotely exculpatory as regards the criminal charges filed against Arlington or that would assist in his defense.

Given that the report was a public document available to Arlington's counsel for the asking, given that Arlington did not object to the prosector's failure to deliver the report, given that Arlington did not otherwise preserve his claim of error and include the report in the record once he obtained it and given that there was absolutely no exculpatory information in the document, we conclude that there is no evidence of any prosecutorial misconduct or prejudice here at all, much less "plain error".

b. Arlington asserts that the prosecution's misstatement of the law in **voir** dire as to the burden of proof for self defense constituted prosecutorial misconduct. The State counters that the error was cured by Arlington's objection, the trial court's correction and the jury instruction.

The following colloquy took place:

Ms. Christopher: Do you also understand with the affirmative defenses that the defense has raised of justifiable use of force, compulsion, some of those, that they have that same burden to prove it beyond a reasonable doubt?

Mr. Hartelius: Your Honor, I object; that's an absolutely false statement of the law.

The Court: That's correct. Yeah. The law is by a preponderance of the evidence on the affirmative defenses.

Ms. Christopher: I'm sorry. Correct.

33

Mr. Hartelius: Well, Your Honor, in reference to justifiable use of force, all we need do is present sufficient evidence of justification to raise a reasonable doubt, whereas compulsion is a preponderance of the evidence.

The Court: Right.

Additionally, jury Instruction No. 9 properly instructed the jury on a defendant's burden of proof for his affirmative defense of justifiable use of force.

An evidentiary issue in State v. West (1992), 252 Mont. 83, 91, 826 P.2d 940, 945, is instructive on this question. This Court stated that:

> . . . when counsel opposes the admission of evidence and the District Court sustains counsel's objection, strikes the evidence from the record, and instructs the jury to disregard the evidence, the error that is committed is presumed cured. (Citation omitted.)

The trial court in West also provided a jury instruction which appropriately settled any remaining questions the jury may have had on the issue. The West Court concluded that any error by the State had been cured by the District Court's admonishment of the jury and reading of the applicable jury instruction. West, 826 P.2d at 946. The principle of West is applicable here. We conclude that the jury was correctly informed and instructed on the burden of proof for self defense.

c. Arlington insists that the prosecution's false comments that he invited DeKoning to his home were improper. The State argues that Arlington did not object to these comments during trial and therefore this is not a proper subject for appeal.

The State is correct, pursuant to § 46-20-104, MCA, unless

34

Arlington can fit his claim of error within an exception to § 46-20-701(2), MCA. See Issue 8a. The exceptions do not apply in this case because (a) the right did exist at the time of the trial, (b) evidence was not suppressed, and (c) material and controlling facts upon which the claim was predicated were known to the defendant and his attorney. Therefore, Arlington has waived appellate review of this issue.

d. Arlington argues that the prosecution falsely stated that he was a jilted lover in her opening statement. The State contends that the prosecution did not refer to Arlington as a jilted lover but her comments to the effect that he had lost Vicki to DeKoninq were supported by testimony at trial.

The prosecution did not refer to Arlington as a jilted lover; that expression was used by Arlington's attorney when he was cross-examining Vicki DeKoninq. The prosecutor stated that the defendant lost Vicki to her husband. This statement is not blatantly false because Vicki testified at trial that her affair with Arlington had ended. Moreover, even if this statement was false, it would not be enough to affect the jury's decision in the face of the overwhelming evidence that Arlington used excessive and unreasonable force against DeKoninq, and was therefore, guilty of aggravated assault.

e. Arlington asserts that a comment by the prosecutor, that Arlington told an unidentified woman that he was going to "kill the husband and make it look like self-defense," prejudiced the defendant and deprived Arlington of a fair trial. The State

asserts that Arlington has not proved prejudice was caused by this single statement which was objected to and which objection was sustained.

The following, which includes the statement at issue, is excerpted from the testimony at trial:

Q. And if that lady said that you told her that you were going to kill the husband and make it look like self-defense, that wouldn't be true?

A. That's a bold-faced lie.

Q. And if she says that you also told her --

MR. HARTELIUS: Your Honor, I'm going to object to this line of questioning as being improper. There's been no witness identified that is supposed to be saying these things. This is beyond the scope of direct examination. It's bringing things in that are easy to talk about, but now as a surprise just to try to smear Ollie, it's wrong.

THE COURT: This is a different person we're talking about, isn't it, that you are questioning about?

MS. CHRISTOPHER: Yes, Your Honor.

THE COURT: I'm going to sustain your objection.

Q. (BY MS. CHRISTOPHER) You mentioned that you were in the military, is that right?

During this colloquy, Arlington had the opportunity to state that he did not make any such statement to an unidentified witness. Additionally, his attorney objected to the prosecution's line of questioning and the trial court sustained that objection. The prosecution then moved on to a new subject.

In another Montana case dealing with the issue of improper comments by the prosecution, this Court stated:

"It has long been the law of this state that prejudice in a criminal case will not be presumed, but must appear from the denial or invasion of a substantial

36

> right from which the law imputes prejudice."...Rhyne has
> not demonstrated that he was prejudiced by the
> prosecution's comment....Significantly, although Rhyne
> objected to the prosecutor's comment, he did not request
> the District Court to admonish the jury panel or give a
> cautionary instruction. Nor did he request a mistrial.
> Given these circumstances, we hold that Rhyne was not
> denied a fair trial as a result of prosecutorial
> misconduct.

State v. Rhyne (1992), 253 Mont. 513, 525, 833 P.2d 1112, 1120.

(Citation omittecl.) Similarly, Arlington has not shown how this statement prejudiced him. If he was concerned that the prosecution's questioning inflamed the jury, he should have asked for a cautionary warning or asked the trial court to admonish the jury. He did neither. Nor did he request a mistrial. The medical testimony and photographic evidence alone was enough to sustain a conviction for aggravated assault. We conclude that Arlington was not denied a fair trial as a result of the prosecution's misstatement.

f. Arlington contends that the State misrepresented his testimony in order to justify the use of the improper rebuttal testimony of Stephen Haagenson. The State insists that Haagenson's rebuttal testimony was proper because Arlington, himself, had "opened the door" to testimony about his relationship with DeKoning.

During his testimony, Haagenson reported that one morning about one month before the incident involving Arlington and DeKoning, Haagenson and Arlington were driving up to Arlington's ranch. DeKoning was driving behind them on the road so Arlington pulled over to the side of the road and returned to his home.

Haagenson stated that Arlington was returning to his home to retrieve his pistol. Arlington told Haagenson that if DeKoning followed him, "or something," Arlington would kill DeKoning. Haagenson also reported that Arlington would sometimes try to talk to Haagenson about how he felt about DeKoning but Haagenson would tell Arlington he did not want to hear about the subject. He did state that at that time, Arlington and DeKoning did not get along.

The State insists that this testimony was appropriate under Rule 404(a)(1), M.R.Evid., because Arlington had previously testified that he was not jealous or angry with DeKoning. Also, the State asserts, Arlington testified that he did not wish to enter into any altercations with DeKoning nor did he ever think about using a gun to injure DeKoning. Thus, the State argues, Arlington opened up the subject of his peaceful character as far as his relationship with DeKoning was concerned.

We agree with the State. Arlington did testify that he was not jealous or angry with DeKoning, rather, he felt sorry for DeKoning. In addition, he testified that he tried to avoid fights with DeKoning nor did he ever think of using a gun to injure DeKoning. Testimony of this type does call into question the appellant's character as it relates to the victim. Arlington was trying to relate that he did not have any real problems with DeKoning and he certainly did not want to become involved in an altercation with him.

Rule 404(a)(1), M.R.Evid., states that:

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for

38

the purpose of proving action in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.

In the instant case, Arlington offered testimony to prove that he had no real animosity toward DeKoning and certainly was not looking for any fight with the victim. At that point, it was permissible for the State to rebut the appellant's testimony about his relatively peaceful relationship with DeKoning under Rule 404(a)(1), M.R.Evid. State v. Baker (1991), 249 Mont. 156, 159, 815 P.2d 587, 589; State v. Mix (1989), 239 Mont. 351, 358-359, 781 P.2d 751, 755-756. Because Haagenson's rebuttal testimony was admissible under Rule 404(a)(1), M.R.Evid., there was no need for the State to adhere to the requirements of the modified Just notice rule. We conclude that the Haagenson testimony was proper rebuttal testimony and no prosecutorial misconduct occurred here.

g. Arlington claims that the prosecution referred to Arlington as a liar in her closing statement. The State insists that no contemporaneous objection was made to such statements and that even if such statements were prejudicial, they were harmless error.

The prosecution did state a number of times, that Arlington had lied to the jury. We have previously stated that it is extremely inappropriate for an attorney to characterize a witness' testimony as lies in a closing argument. State v. Musgrove (1978), 178 Mont. 162, 172, 582 P.2d 1246, 1252-1253; State v. Rodgers (1993), 257 Mont. 413, 417, 849 P.2d 1028, 1031. We repeated in Rodgers, and we reiterate here, our strong disapproval of

characterizing a witness' testimony as lies or a witness as a liar. It is highly improper for a prosecutor to comment about the credibility of the defendant or in any way, to invade the province of the jury.

However, Arlington made no contemporaneous objection to the prosecution's characterization of him as a liar. This fact precludes this Court from addressing the issue under § 46-20-104(2), MCA, unless the criteria under § 46-20-701(2), MCA, can be met or the comments create an exception under the "plain error" doctrine. Rodgers, 849 P.2d at 1031. Wilkins, 746 P.2d at 580.

Our review of the prosecution's error leads us to conclude that Arlington cannot meet the necessary criteria under § 46-20-701(2), MCA, and that Arlington's request that this Court apply the "plain error doctrine" to prevent manifest injustice is, likewise, without merit. "The power of discretionary review is to be employed sparingly . . ..the plain error doctrine 'will be used in exceptional cases and should not be relied upon by counsel."' Wilkins, 746 P.2d at 589. Although the Rodgers Court did not "foreclose the option to invoke the plain error doctrine in a future case involving prosecutorial misconduct," we did not invoke the doctrine in that specific case. Rodaers, 849 P.2d at 1032. This is not the future case envisioned by the Rodsers Court. Although the prosecution unquestionably committed error in commenting on the credibility of the defendant, there was no contemporaneous objection and, in the face of the overwhelming evidence establishing the severity of the beating to which

40

Arlington subjected **DeKoning,** we conclude that the prosecutor's comments should be classified as harmless error. <u>Mix,</u> 781 **P.2d** at 754.

We close our discussion on this point with the following observation, however. Any trial counsel who invades the province of the jury by characterizing a party or a witness as a liar or his testimony as lies, is treading on thin ice, indeed. Was there not overwhelming evidence of Arlington's use of excessive force and of his guilt, and was there not substantial medical, physical and corroborative evidence independent of the testimony of the defendant and the victim, the prosecution in this case might well be looking forward to a new trial by reason of the prosecutor's comments.

h. Arlington argues that his case should be dismissed because of prosecutorial misconduct, in that the prosecutor knowingly used an incompetent witness at his sentencing hearing. He contends that the sentencing court relied on her testimony to excessively sentence him. The State asserts that there was no indication in the record that the witness was incompetent to testify at the hearing nor did Arlington object to her testimony.

A review of the record demonstrates that Arlington did not object to the witness' testimony at the time of the sentencing hearing, December 30, 1992. In general, the failure to object constitutes a waiver of the objection under § 46-20-104, MCA. Exceptions to this rule are provided by § 46-20-701, MCA, discussed above.

41

The witness' testimony at issue here does not fall under any of the exceptions allowed under § 46-20-701, MCA. At trial, Arlington's attorney questioned the witness about being under the care of a mental health professional and her use of the drug, Prozac. He also asked her if she had a clear memory. Furthermore, since Arlington's attorney had some knowledge that she had some mental health problems, her mental health condition was not, therefore, being suppressed, the right to object to her testimony did exist at the time of the hearing and Arlington knew sufficient facts about the witness' mental status that, if he determined additional facts were necessary, he could have ascertained those with reasonable diligence.

Obviously, Arlington had enough information about the witness to have some concerns over her competency as a witness in light of his questions to the witness. At that point, Arlington's attorney should have objected to her testimony or requested an examination of the witness regarding her competency to testify. State v. Stephens (1982), 198 Mont. 140, 141, 645 P.2d 387, 388.

Rule 601, M.R.Evid., governs the competency of witnesses. It provides:

> (a) General rule competency. Every person is competent to be a witness except as otherwise provided in these rules.
> (b) Disqualification of witnesses. A person is disqualified to be a witness if the court finds that (1) the witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand the witness or (2) the witness is incapable of understanding the duty of a witness to tell the truth.

A review of the witness' testimony convinces us that the

42

witness was capable of expressing herself as to the matter at issue in a way that could be understood by the judge. Additionally, she seemed to know the importance of telling the truth. Her testimony did not seem bizarre or irrational.

In an earlier Montana case discussing the competency of a witness, this Court stated:

> The rules of evidence were enacted on July 1, 1977. Prior to that the Montana statute provided that those of unsound mind could not be witnesses. Section 93-701-3(1), R.C.M.1947. Even with that statute this Court held that "there is no presumption that a witness is incompetent and the burden is on the party asserting incompetency to prove it." The enacting of the rules in 1977 did not create any presumptions. The defendant is required to prove incompetency and it is the function of the trial judge to determine the competency of the witness to testify.
>     The Defendant did not submit any additional evidence of incompetency beyond the 1975 and 1976 Warm Springs State Hospital evaluation. While these reports show 1976 diagnoses of mental disorders, the reports also indicate that he was very much improved. In and of themselves, these reports are not sufficient to require a conclusion that the witness was incompetent, incapable of expressing himself concerning the matter, or incapable of understanding the duty to tell the truth.

Stevhens, 645 P.2d at 389-390. (Citation omitted.) In Stevhens, there were medical reports to indicate that the witness, Bex, had mental health problems and had been deemed unfit to proceed in his own criminal proceedings. However, he was found competent to testify at the criminal proceedings against Stephens, Bex' accomplice, after attorneys for both sides conducted an examination of his competency to testify and he then did provide testimony at Stephens' trial.

At the time of the instant witness' testimony, there were not even medical reports or other forms of evidence, such as those

43

reviewed in <u>Stephens</u>, to provide a basis for questioning the witness' competency. There was no evidence that she was incapable of expressing herself or incapable of understanding her duty to tell the truth. This Court will not presume a witness is incompetent to testify; the defendant is required to prove incompetency and in the instant case, he did not so prove. <u>Stevhens,</u> 645 P.2d at 389. We conclude that the defendant did not carry his burden to prove that the witness was incompetent. Therefore, it was not prosecutorial misconduct to present the woman's testimony at the sentencing hearing.

i. The final issue regarding the alleged misconduct of the prosecution involves the prosecutor's suggestion during voir dire that Arlington had alternatives to defending himself, his son and his home. Arlington contends that the prosecutor should not have questioned him about why he did not retreat when DeKoning came to his house, because in Montana, there is no duty to retreat. The State counters that the prosecution never stated that there was a duty to retreat: she merely questioned whether Arlington's opening the door to DeKoning under the circumstances was reasonable. Also, the State insists that Arlington should have objected to the prosecutor's comments if he was concerned about prosecutorial misconduct.

The prosecution did mention alternatives to leaving the trailer to meet DeKoning face to face in voir dire, her cross-examination of Arlington and in her closing argument. However, at no time did Arlington object to her comments. As stated above,

44

pursuant to § 46-20-104, MCA, if Arlington failed to object, he cannot raise the issue for the first time on appeal, unless he meets the criteria for an exception under § 46-20-701, MCA, or in very rare instances, this Court invokes the "plain error" doctrine.

The exceptions under § 46-20-701(2), MCA, include instances where the right asserted in the claim did not exist at the time of trial, the prosecutor, the judge or a law enforcement agency suppressed evidence, or material facts upon which the claim is based were unknown to the defendant and could not have been ascertainedwith reasonable diligence. Section 46-20-701(2)(a),(b) and (c), MCA. Clearly, none of these exceptions apply to this claim.

Moreover, the "plain error" doctrine is invoked only in rare cases to prevent manifest injustice. State v. Voegele (1990), 243 Mont. 222, 224, 793 P.2d 832, 834. In this case, the prosecutor did not state that there is a duty to retreat in Montana: she merely questioned whether there might have been alternatives to Arlington's decision to open the door. In view of Arlington's claim of justifiable use of force, his knowledge of DeKoning's drinking that evening and his sometimes violent behavior, it was not inappropriate to determine whether the defendant could have made other choices. The prosecutor's conduct was not so outrageous as to indicate a "plain error." Rodgers, 849 P.2d at 1032. We conclude that Arlington's failure to object at trial constitutes a waiver of his present claim.

In conclusion, we hold that substantial rights of the

45

defendant were not violated due to prosecutorial misconduct. In total, any errors by the prosecution are harmless in the face of the overwhelming evidence to support Arlington's conviction.

ISSUE NINE

Did the District Court err by sentencing Arlington under the weapon enhancement statute?

Arlington claims that he should not have been sentenced under the weapon enhancement statute because no weapon was charged, there was no proof that a weapon was used and there was no real notice of intent to use the weapon enhancement statute. The State contends that it alleged the use of a weapon in its affidavit for leave to file an information, testimony showed that a weapon was used in the assault and Arlington had actual notice that his use of a weapon would be considered by the District Court at sentencing.

The applicable portion of the weapon enhancement statute reads:

> (1) A person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished, or otherwise used a firearm, destructive device, as defined in 45-8-332(1), or other dangerous weapon shall, in addition to the punishment provided for the commission of such offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years, except as provided in 46-18-222.

Section 46-18-221(1), MCA.

Due process requires the State to provide some notice to the defendant in the charging document if a sentence will be enhanced because of the use of a weapon, "if the issue is not inherent in the definition of the substantive charges." State v. Krantz

46

(1990), 241 Mont. 501, 512, 788 P.2d 298, 305.

In the instant case, Arlington's use of a weapon was neither referred to in the information nor did the charge of aggravated assault necessarily entail the use of a weapon. Accordingly, the State's failure to allege the use of a weapon in the charging document was error. As in _Krantz_, however, we conclude that the error was harmless.

Here, the State provided hand delivered notice to Arlington on the evening before his December 30, 1992 sentencing, that it would seek an enhanced sentence due to his use of a weapon in the commission of the aggravated assault. Arlington's argument that this notice was too little, too late, however, is without merit.

Although the information did not provide that a weapon was used in the commission of the aggravated assault, the affidavit for leave to file an information included reference to the use of a weapon, stating:

> The Defendant swung at him with something the victim described as resembling a 2x4 or a baseball bat. The first swing sent the victim to the ground. After that the Defendant continued to beat the victim, until the victim lost consciousness... .When [Deputy] Tadman spoke with the ambulance attendants, he was told that the victim was suffering head lacerations and that the victim said he had been hit with a bat.

Additionally, there were numerous references to the use of a bat or a blunt object during the course of the trial. The prosecutor referred to a bat during her opening statement, and the victim related that the defendant attacked him with a bat. Witness Elam testified that she heard the sound of very hard hitting, similar to the sound of a bat hitting a sandbag. Dr. Gallea stated

47

that the pattern of the injuries suggested that something that was heavy and elongated and relatively even in its pattern was used in the beating since the bruises had an elongated symmetrical even pattern. Dr. Schaefer stated that in his opinion, the injuries were inflicted by the use of a **"long,** cylindrical object." Dr. Gorsuch stated that the injuries were **"more** consistent with a hard object such as a baseball **bat."**

Moreover, in its Judgment of Conviction and Sentencing Order, the District Court found evidence during the trial to be suggestive of injuries sustained by the use of a weapon, stating:

> Although the defendant denies using any type of dangerous weapon in connection with the assault, the Court finds from the evidence presented at the trial (especially the medical testimony) that some type of hard object must have been used to inflict the injuries sustained by the victim. A baseball bat was referred to during trial but no baseball bat was introduced into evidence. However, the Court would find that a dangerous weapon in the form of either a baseball bat, or a two-by-four, or a baton, was used by **the** defendant in this case.

The above statements suggest that the defendant had "actual notice" that the State, as per § 46-18-221, MCA, would seek to have Arlington's sentence enhanced. The notice provided here was found to be sufficient in <u>Xrantz,</u> 788 **P.2d** at 305-306. The <u>Krantz</u> Court stated that the fact that the State alleged use of a weapon in its affidavit and motion for leave to file an information, and the use of a weapon was alluded to in testimony, sufficiently notified the defendant that the use of a weapon would be considered at sentencing.

We find the situation here to be substantially similar, and hold that the failure to allege the use of a weapon in the charging

48

document was harmless error and did not violate Arlington's right to due process because the defendant had actual notice that his sentence could be enhanced because of the use of a weapon.

ISSUE TEN

Were Arlington's constitutional rights violated because he was sentenced under the weapon enhancement statute rather than through the charge of felony assault with a weapon?

Arlington declares that he should have been charged with felony assault with a weapon, rather than aggravated assault and the weapon enhancement statute because felony assault is a lesser included offense of aggravated assault. The State replies that felony assault is not a lesser included offense of aggravated assault. We agree.

The test for determining whether an offense is a lesser included offense of another offense was stated in Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306, to be:

> . ..where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Iannelli v. United States (1975), 420 U.S. 770, 785, fn. 17, 95 S.Ct. 1284, 1294, fn. 17, 43 L.Ed.2d 616, 627, fn. 17, further explained the Blockburser test, stating:

> If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.

Therefore, in order to determine whether felony assault is a

49

lesser included offense of aggravated assault, we must ascertain whether each charge requires proof of a fact that the other does not.   State v. Madera (1983), 206 Mont. 140, 151, 670 P.2d 552, 558.

Section 45-5-202(2), MCA, defines felony assault and provides:

> (2) A person commits the offense of felony assault if he purposely or knowingly causes:
> (a) bodily injury to another with a weapon;
> (b) reasonable apprehension of serious bodily injury in another by use of a weapon: or
> (c) bodily injury to a peace officer or a person who is responsible for the care or custody of a prisoner.

Section 45-5-202(1), MCA, defines aggravated assault and provides:

> (1) A person commits the offense of aggravated assault if he purposely or knowingly causes serious bodily injury to another.

Arlington insists that subsection (2)(a) applies to him and is a lesser included offense of subsection (1), aggravated assault. The elements of subsection (2)(a) are: 1)purposely and knowingly; 2)causes bodily injury; 3)to another; and 4)with a weapon.  The elements of subsection (1) are: 1)purposely and knowingly: 2) causes _serious_ bodily injury: and 3)to another.  _Serious_ bodily injury and bodily injury are not the same element.   "'Bodily injury' means physical pain, illness, or any impairment of physical condition and includes mental illness or impairment." Section 45-2-101(5), MCA.  "'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes  serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ.   It includes

50

serious mental illness or impairment." Section 45-2-101(59), MCA. Here, there was overwhelming medical evidence, with two broken legs, a broken arm, a serious head injury with some permanent brain damage and hearing loss, that DeKoning suffered _serious_ bodily injury, not bodily injury.

Even though there may be substantial overlap in the proof which would be offered to establish both crimes, serious bodily injury, an element of aggravated assault, requires proof of different facts than does bodily injury, an element of felony assault. _Madera,_ 670 P.2d at 558. See also State v. Albrecht (1990), 242 Mont. 403, 407-408, 791 P.2d 760, 763.

Additionally, subsection (2)(a) requires that a person cause bodily injury to another _with a_ _weapon._ However, the crime of aggravated assault does not contain the element - with a weapon. See § 45-5-202(1), MCA. There is, thus, an additional element which must be proven to convict a person of felony assault under subsection (2)(a) that is not required for proof of the offense in subsection (1). 'The_Blockburser_ test is met and felony assault is not a lesser included offense of aggravated assault. _Madera,_ 670 P.2d at 558.

Finally, "[W]hen the facts of a case support a possible charge of more than one crime, the crime to be charged is a matter of _prosecutorial discretion._" State v. Mahoney (1994), -Mont. ___, __ P.2d ___, 51 St.Rep. 160, 162. See also State v. Booke (1978), 178 Mont. 225, 230, 583 P.2d 405, 408. We hold that Arlington's constitutional rights were not violated when he was charged with

51

and convicted of aggravated assault and his sentence was enhanced under the weapon enhancement statute.

### ISSUE ELEVEN

Did the District Court err when it failed to order a new sentencing due to irregularities at sentencing?

Arlington maintains that the District Court erred when it failed to order a new sentencing due to irregularities at the sentencing hearing, including the testimony of an incompetent person. The State argues that the District Court did not have jurisdiction to decide whether the appellant was entitled to be resentenced. We agree with the State.

On December 30, 1992, the District Court sentenced Arlington to ten years in the Montana State Prison, with six years suspended, and two years in prison for the use of a dangerous weapon. That same day, Arlington filed a notice of appeal to this Court.

On February 24, 1993, Arlington filed a motion and brief before this Court requesting this Court to stay the appeal until the District Court conducted a hearing on his motion for a new trial based on newly discovered evidence. On March 16, 1993, this Court granted Arlington's motion to remand the case to the District Court to hear his motion for a new trial. The case was <u>not</u> remanded for the resolution of any other motion or issue.

However, on May 21, 1993, the District Court conducted a hearing wherein it considered Arlington's motion for a new trial, his motion for dismissal due to prosecutorial misconduct, and his motion for resentencing. The District Court <u>lost</u> jurisdiction of

the *Arlington* case at the time that he filed his notice of appeal to the Montana Supreme Court. State v. Laverdure (1984), 212 Mont. 31, 32, 685 P.2d 375, 376. See also Julian v. Buckley (1981), 191 Mont. 487, 491-492, 625 P.2d 526, 528. ("[W]hen a notice of appeal has been filed, jurisdiction . ..passes from the District Court and vests in the Supreme Court. It becomes the Supreme Court's duty to maintain the status quo of the parties until the controversy can be determined.")

The only issue which the Supreme Court remanded to the District Court was the motion for a new trial based on newly discovered evidence. The District Court did not have jurisdiction to decide any other issue, including resentencing. We hold that the District Court did not have jurisdiction to decide whether Arlington should have been resentenced. Accordingly, Arlington cannot predicate error on the court's failure to resentence.

### ISSUE TWELVE

Did the District Court err when it failed to find an exception to the mandatory minimum sentencing for aggravated assault?

Arlington contends that two of the exceptions to the mandatory minimum sentencing statute apply in his case. The State replies that the mandatory minimum statute does not apply because Arlington was not sentenced to the minimum standard sentence. It also argues that neither the substantial mental impairment nor the duress exceptions apply in the instant case, even if this Court decided this issue on the merits.

Section 45-5-202(3), MCA, provides that "[a] person convicted

53

of aggravated assault shall be imprisoned in the state prison for a term of not less than 2 years or more than 20 years and may be fined not more than $50,000, except as provided in 46-18-222." In the instant case, Arlington was sentenced to ten years for the aggravated assault, with six years suspended, plus two years for the use of a weapon in the assault. Section 46-18-222, MCA, provides for six exceptions to mandatory minimum sentences.

The State cites State v. Stroud (1984), 210 Mont. 58, 683 P.2d 459, and State v. Nichols (1986), 222 Mont. 71, 720 P.2d 1157, for the proposition that when a sentencing court does not intend to sentence the defendant to the minimum sentence, the exceptions of § 46-18-222, MCA, do not apply. Stroud states that "[b]ecause the judge was not disposed to give the minimum sentence, there is no chance that he would have given less than the minimum sentence." Stroud, 683 P.2d at 469. Therefore, the Stroud Court found § 46-18-222, MCA, inapplicable. In Nichols, this Court stated, "the purpose of the statute is to allow a judge who would otherwise have to pronounce the minimum sentence, to sentence a defendant to less than the minimum sentence when the exceptions apply to the facts." Nichols, 720 P.2d at 1164. Clearly, the mandatory minimum sentence exceptions statute does not apply unless a sentencing court is considering imposing the mandatory minimum sentence and one or more of the exceptions possibly apply. In the instant case, the sentencing court did not sentence Arlington to the minimum sentence of two years, rather he was sentenced to ten years in the state prison with six years suspended.

54

In this case, the District Court did conduct a hearing under § 46-18-223, MC!A, to determine if the argued exceptions, subsections (2) and (3) of § 46-18-222, MCA, applied. It concluded that the defendant's mental capacity was not substantially impaired to the extent that it would bring Arlington within the exception of § 46-18-222(2), MCA, nor was Arlington under unusual and substantial duress to bring him within the exception of § 46-18-222(3), MCA. Although this Court does not have to address the ruling on the hearing because § 46-18-222, MCA, does not apply in the instant case, we do conclude that the evidence, in total, supports the District Court's conclusion that subsections (2) and (3) of § 46-18-222, MCA, were not applicable in Arlington's case. We hold that the District Court did not err in failing to apply the exceptions to the mandatory minimum sentence here.

AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

55

May 16, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Channing J. Hartelius
Hartelius, Ferguson & Baker
P.O. Box 1629
Great Falls, MT 59403-1629

Brant S. Light
Attorney at Law
2000 Sixth Ave. No.
Great Falls, MT 59401

Hon. Joseph P. Mazurek
Attorney General
Justice Bldg.
Helena, MT 59620

Patrick L. Paul, County Attorney
Deborah Kim Christopher, Deputy
Cascade County Courthouse
Great Falls, MT 59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy